465 F.3d 46
 Kent PAPINEAU, Plaintiff,
Nedrick Ashton, Clay Rockwell, Abilene Rockwell, Houston Rockwell, Onenhaida Rockwell and Juanita Lewis, Plaintiffs-Counter-Defendants,
Shawn Jones, Andrew Jones, Stonehorse Goeman, Marie Peters, Wealthy Bucktooth, individually and as guardian ad litem for Holly Lyons, Robert E. Bucktooth Jr., Cheryl Bucktooth, individually and as guardian ad litem for Nadine and Rob Bucktooth, Martha Bucktooth, Roberta Bucktooth, Jordan Bucktooth, Robert Bucktooth, Ronald Jones Sr., Ruth Jones, Debby Jones, Karen Jones, Nikki Jones, Karoniakata Jones, Tracy Kappelmeier, individually and as guardian ad litem for Adam Kappelmeier and Matthew Kappelmeier, Shirley Snyder, Andrea Potter, Samantha Thompson, Martha J. Skye, Steven Lee Skye, Cara Skye, Andrew Skye, Stormy Skye, Verna Montour, Sesiley R. Snyder, Alice Thompson, Minnie Garrow, Frances Dione, Wentawawi Dione, Joely Vandommelen, Daronhiokwas Horn, A'Anase Horn, Tekahawakwen Rice, Kahente Horn Miller, Kahentinetha Horn, Karonhioko'He Horn, Malcolm Hill, Kathy Melissa Smith, William Green III, Kevin Henhawk, Dyhyneyyks, Mona Logan, Gerald Logan,
Anthony Kloch Jr., Frank Bistrovich, Brent Lyons, Brad Cooke, Janet Cornelius, Jina Jimerson, Duane Beckman, Chad Hill, Donna Hill, Steve Stacy, Dale Dione, Robin Wanatee, Joshua Wanatee, Ally M. Wanatee, Esther Sundown, Shelley George, Sheena Green, Shiela Fish, Garrett Bucktooth, Joe Stefanovich, Tyler Hemlock, Hayden Hemlock, Skroniati Stacy, Kakwirakeron, Tekarontake, Teyonienkwataseh, Daniel Moses, Andrew Moses, Ross John, Barry Buckshot, Seth Tarbell, Deirdre M. Tarbell and Andrew Buckshot, Plaintiffs-Counter-Defendants-Appellees-Cross-Appellants,
v.
James J. PARMLEY, George Beach, Pamela R. Morris, Dennis J. Blythe, John F. Ahern, Joseph W. Smith, Jeffrey D. Sergott, Michael S. Slade, James D. Moynihan, James J. Jecko, Robert Haumann, Mark E. Chaffee, Christopher J. Clark, Paul K. Kunzwiler, Douglas W. Shetler, Patrick M. Dipirro, Gregory Eberl, Gary A. Barlow, Mark E. Lepczyk, Martin Zubrzycko, Glenn Miner, Gary Darstein, Kevin Buttenschon, Chris A. Smith, Norman J. Mattice, John E. Wood, Thomas P. Connelly, Jerry Brown, Harry Schleiser, Norman Ashbarry, Peter S. Leadley, Martin J. Williams, Gloria L. Wood, David G. Bonner, Dennis J. Burgos, John P. Dougherty, David v. Dye, Daryl O. Free, James J. Greenwood, Andrew Halinski, Robert B. Heath, Robert H. Hovey Jr., Robert A. Jureller, Stephen P. Kealy, Troy D. Little, Edward J. Marecek, Ronald G. Morse, Paul M. Murray, Anthony Randazzo, Allen Riley, Frederick A. Smith and Steven B. Kruth, Defendants-Cross-Defendants-Appellants-Cross-Appellees,
County of Onondaga, Onondaga County Sheriff's Department, Kevin Walsh, Onondaga County Sheriff, in his official and personal capacity, Defendants-Cross-Appellees,
James W. McMahon, Superintendent of New York State Police, in his official and personal capacity, Town of Onondaga, and the following persons in their personal and official capacities as New York State Troopers, Allen v. Svitak Jr., Michael L. Delorenzo, James A. Armstrong, Mark Williams, Clifford A. Heaslip, Edward C. Fillingham, Kimberly A. Fillingham, Jeffrey D. Raub, Mark Bender, Peter Obrist, Eric D. Parsons, Robin Palmer, Michael Grandy, Thomas Irwin, George Mercado, Frank Jerome, James Rogers, Art Brocolli, John Doe, William M. Agan, William M. Ambler, Donald W. Barker, Mark A. Caporuscio, Michael G. Conroy, Peter A. Kalin, Matthew J. Navin, William J. Armstrong, George M. Atanasoff, David R. Barry, Peter J. Beratta, Steven M. Bourgeois, George W. Brownsell, Robert M. Burney, Rodney W. Campbell, Mary A. Clark, Mark Dembrow, Gerald J. Deruby Jr., Michael L. Downey, Gary W. Duncan, John Evans, John J. Fitzgerald, Robert Gardner, John E. Giddings, Douglas R. Gilmore, Gary L. Greene, Andrew A. Lucey, James Martin, James W. O'Brien, Gary Oelkers, Derrick A. O'Meara, Richard J. Sauer, Michael H. Scheibel, Gary S. Schultz, Timothy G. Siddall, Robert J. Simpson, Katherine Smith, Jay Strait, Michael R. Tinkler, Michael J. White, Donald M. Dattler, Thomas E. Elthorp, Harrison Greeney, Matthew A. Turrie, Dennis J. Cimbal and Kenneth Kotwas, Defendants-Cross-Defendants.
 Docket No. 05-1830-cv (L)
 Docket No. 05-2035-cv (XAP).
 United States Court of Appeals, Second Circuit.
 Argued: June 5, 2006.
 Decided: October 4, 2006.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Frank Brady, Assistant Solicitor General (Eliot Spitzer, Attorney General of the State of New York, Daniel Smirlock, Peter H. Schiff, Nancy A. Spiegel, on the brief), Albany, NY, for defendants-cross-defendants-appellants-cross-appellees.
 Jodi Peikin, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C. (Robert J. Anello, on the brief), New York, NY, for plaintiffs-counter-defendants-appellees-cross-appellants.
 Anthony P. Rivizzigno, County Attorney (Carol L. Rhinehart, on the brief), Syracuse, NY, submitted brief for defendants-cross-appellees.
 Before WALKER, Chief Judge, NEWMAN and SOTOMAYOR, Circuit Judges.
 SOTOMAYOR, Circuit Judge.
 
 
 1
 Individual state defendants-cross-defendants-appellants-cross-appellees James J. Parmley et al. (the "defendants") appeal from the March 28, 2005 order of the United States District Court for the Northern District of New York (Scullin, C.J.), Jones v. McMahon, No. 98-CV-374, 2005 WL 928667 (N.D.N.Y. Mar. 28, 2005), which denied defendants' summary judgment motion for qualified immunity on plaintiffs-counter-defendants-appellees-cross-appellants Andrew Jones et al.'s (the "plaintiffs") claims of First and Fourth Amendment violations stemming from defendants' alleged misconduct in dispersing plaintiffs' demonstration in May 1997. Specifically, defendants contend the district court's denial was flawed because (1) even under plaintiffs' facts, it was objectively reasonable as a matter of law for defendants to believe that the demonstration presented a "clear and present danger" after several protesters had entered the roadway of an interstate freeway and (2) the court misconstrued our precedent in Atkins v. New York City, 143 F.3d 100 (2d Cir.1998), in holding that any force used in connection with an arrest that lacked probable cause is by definition excessive. Defendants also appeal the district court's refusal to recognize their assertion of qualified immunity on plaintiffs' state-law claims.
 
 
 2
 Plaintiffs cross-appeal the district court's March 28 and April 20, 2005 rulings that granted summary judgment to all defendants on some of their claims and to defendants New York State Police ("NYSP") Superintendent James W. McMahon and Onondaga County Sheriff Kevin Walsh on all claims; granted sua sponte summary judgment on all claims to the County of Onondaga, the Onondaga County Sheriff's Department ("Sheriff's Department"), and NYSP troopers Mark Bender and Peter Obrist; and denied plaintiffs Marissa Horton and Verna Montour's motion for reconsideration of the dismissal of their excessive force claims.
 
 
 3
 For the reasons that follow, we AFFIRM the district court's decision denying qualified immunity to defendants, and DISMISS plaintiffs' cross-appeal for lack of jurisdiction because it presents no issues that are "inextricably intertwined" with defendants' appeal.
 
 BACKGROUND
 
 4
 On October 7, 2005, this Court denied plaintiffs' motion to dismiss this appeal, which had contended that the order appealed from was a non-final denial of a motion for summary judgment. We held that although the district court's rejection of the defendants' motion for summary judgment on qualified immunity grounds was based on the court's determination that there were genuine issues of material fact still to be resolved, this appeal could go forward because defendants had stipulated to plaintiffs' facts for the purposes of this appeal. See Salim v. Proulx, 93 F.3d 86, 89 (2d Cir.1996) (holding that, where a district court rejects a defense of qualified immunity based on disputed issues of fact, "an appeal is available where the defendant accepts, for purposes of the appeal, the facts as alleged by the plaintiff"). Thus, for the purposes of this appeal, we accept the facts as alleged by the plaintiffs.
 
 I. The Facts
 
 5
 In May 1997, plaintiffs, several dozen members of the Onondaga Nation and their supporters, organized a protest to express their opposition to an agreement between the chiefs of the Onondaga Nation and the State of New York that would permit the State to tax tobacco products sold to non-Native Americans on land belonging to the Onondagas. The protest was held on private property belonging to plaintiff Andrew Jones, an Onondaga who opposed the agreement. Jones's property includes the paved portion of Interstate 81 ("I-81" or the "Interstate"), which the State has a non-exclusive right to use under a limited easement granted to the Department of Public Works, as well as acreage adjacent to the highway on which his house and yard are located.
 
 
 6
 The protest began on May 8, 1997, with the lighting of a ceremonial fire. Shortly thereafter, law enforcement officers from the Sheriff's Department visited the protest and allowed it to proceed. The protest continued, peacefully and with the consent of the Sheriff's Department, for ten days; the protesters were at all times orderly and peaceful and did not disturb nor harass neighbors, motorists or passersby who witnessed the demonstration. On May 18, the protesters circulated a flyer announcing that a "media event" would be held that day to protest the tobacco agreement. The Sheriff's Department became aware of these plans, and heard rumors that the protesters planned to block I-81 temporarily to draw attention to their cause.
 
 
 7
 The May 18 gathering was attended by men, women and children of all ages. At approximately 1:45 p.m., a small group of Onondaga protesters, possibly including some plaintiffs,[1] briefly entered the I-81 roadway to distribute literature pertaining to their protest; the group's presence on the highway caused traffic to slow down. Meanwhile, the NYSP took over the job of monitoring the protest from the Sheriff's Department, and at a at a "staging area" north of Jones's property on I-81, they began assembling what they referred to as the "Indian Detail." This group consisted of seventy State troopers dressed in full riot gear and bearing riot batons. A videotape made at the time reveals some troopers joking about their "sticks" and how every trooper has "gotta have a stick." One trooper is heard loudly informing another that the protesters needed "to get their asses kicked." Another trooper is recorded saying that he intended to stay behind because "no one's getting me on some federal process."[2] Troopers in the "Indian Detail" had removed their name tags, even though the State Police Manual requires name tags to be worn at all times.
 
 
 8
 As the NYSP began leaving the staging area, plaintiff Stonehorse Goeman, a leader of the protest and resident of the Onondaga reservation, attempted to persuade those on the roadway to leave the Interstate and return to the main demonstration on Jones's private property. Goeman also attempted to communicate the protesters' peaceful intentions to NYSP officers at the scene, but his attempts were met by silence or threats of arrest. After the Onondagas had left the highway, the NYSP closed off the northbound lanes of I-81 for several hundred feet. The State troopers began marching towards Jones's property, where they assembled on the eastern shoulder of the roadway, forming a "skirmish line" facing the protesters, who were gathered approximately seventy feet off the highway. At the time the troopers formed their skirmish line, none of the protesters was located on or near the highway; they were all peacefully assembled around the ceremonial fire on Jones's private property. They allege they made no threats, engaged in no violent behavior, displayed no weapons and made no effort to move toward the line of troopers.
 
 
 9
 The NYSP troopers remained on the skirmish line for no more than thirty-five seconds, at which point they received a "go ahead" order from Major Parmley. Parmley acknowledges that at the time he gave this order, he was located at the staging area north of Jones's property, where he could not see the protesters and did not know what they were doing. As soon as the troopers received the "go ahead" order, the defendants charged into the demonstration and began arresting protesters allegedly indiscriminately, assaulting plaintiffs, beating them with their riot batons, dragging them by their hair and kicking them. Defendants also allegedly threw one man, who was praying, to the ground and choked him. Plaintiffs further assert that the police manhandled an eleven-year-old girl and an elderly medicine woman and even tossed an infant in a double leg cast from his stroller.
 
 
 10
 Prior to these actions, the troopers allegedly did not order the protesters to disperse or provide them with any warning or justification for their actions. Defendants concede that they had no idea, when making these arrests, which of the protesters had entered the roadway. Much of what plaintiffs allege was captured on videotape, although, plaintiffs assert, the NYSP attempted to prevent people with cameras from recording all of the events by putting their hands over the lenses and threatening cameramen with arrest.
 
 
 11
 II. Litigation Resulting from the May 18 Arrests
 
 
 12
 The demonstrators who were arrested were charged with various state law crimes, and in a September 9, 1997 decision, Justice Philip Miller of the Town of Onondaga Justice Court dismissed all charges against plaintiffs except for a disorderly conduct charge against medicine woman Marie Peters, finding the informations legally insufficient to establish the charged offenses and raising "serious questions" about the troopers' hearsay testimony that several plaintiffs refused to move from the roadway, were intentionally or recklessly creating a risk of public inconvenience or disregarded a lawful order of the police to disperse. Justice Miller subsequently dismissed the remaining claim against Peters on the merits.
 
 
 13
 Similarly, on March 5, 1998, Onondaga County Court Judge William Burke dismissed all of the State's initial charges against plaintiff Kenneth Kappelmeier, rejecting defendants' allegation that Kappelmeier was acting with intent to cause public disruption or interfere with the troopers; finding that no evidence supported defendants' allegation that Kappelmeier was on the roadway; and holding that the evidence showed that the confrontation between Kappelmeier and the troopers occurred not on the roadway but on Jones's property, which Jones's invitees had a right to use. The State thereafter produced new facts and new charges against Kappelmeier, largely supported by testimony from a NYSP trooper who testified for the first time before a second grand jury that Kappelmeier was running back and forth in a provocative manner. The jury subsequently acquitted Kappelmeier of all charges.
 
 
 14
 The case now before us originated in the United States District Court for the Northern District of New York. The plaintiffs alleged that the defendants, inter alia, violated their rights to freedom of speech, religion and assembly, used excessive force, engaged in a conspiracy to violate their rights, violated their right to equal protection, were deliberately indifferent to plaintiffs' medical needs and inflicted severe emotional distress. They also filed claims against NYSP Superintendent James W. McMahon, Onondaga County Sheriff Kevin Walsh, the County of Onondaga and the Sheriff's Department.
 
 
 15
 After several years of litigation, the district court denied the defendants' motions for summary judgment on the basis of qualified immunity on plaintiffs' First Amendment and excessive force claims, finding that disputed factual issues remained to be resolved before the court could rule on the qualified immunity issue. Jones, 2005 WL 928667, at *9-*12. The court granted Walsh and McMahon's respective motions for summary judgment. Id. at *6. The court also granted summary judgment sua sponte in favor of Onondaga County and its Sheriff's Department, dismissed several of plaintiffs' other claims and dismissed several defendants from the lawsuit. Id. at *2-*7. The defendants timely appeal from the district court's denial of their motions for summary judgment based on qualified immunity and its decision not to apply the qualified immunity defense to dismiss plaintiffs' state-law claims.
 
 
 16
 The plaintiffs timely cross-appeal from the district court's grant of summary judgment to Walsh and McMahon, the court's dismissal of their equal protection, conspiracy, indifference to medical needs and infliction of emotional distress claims, and the court's sua sponte dismissal of several defendants and other legal claims.
 
 DISCUSSION
 I. Jurisdiction over Defendants' Appeal
 
 17
 The denial of a motion for summary judgment is normally not "immediately appealable because such a decision is not a final judgment." O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d 29, 38 (2d Cir.2003) (citing 28 U.S.C. § 1291). "Under the collateral order doctrine, however, the denial of a qualified-immunity-based motion for summary judgment is immediately appealable to the extent that the district court has denied the motion as a matter of law, although not to the extent that the defense turns solely on the resolution of questions of fact." Id. (citing Behrens v. Pelletier, 516 U.S. 299, 313, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996)). Indeed, where, as here, defendants have accepted the plaintiffs' version of the facts for purposes of the appeal, they may challenge the district court's rejection of a qualified-immunity-based motion for summary judgment by arguing that the facts asserted by the plaintiffs "entitle [them] to the defense of qualified immunity as a matter of law." Salim v. Proulx, 93 F.3d 86, 91 (2d Cir.1996). We accordingly have appellate jurisdiction over the limited question of law presented by defendants' appeal.
 
 II. Qualified Immunity
 
 18
 Against this backdrop, we review de novo a district court's denial of a summary judgment motion based on a defense of qualified immunity. Savino v. City of New York, 331 F.3d 63, 71 (2d Cir.2003). Our review at this juncture is limited to "circumstances where the qualified immunity defense may be established as a matter of law." Cartier v. Lussier, 955 F.2d 841, 844 (2d Cir.1992). Although we must examine "whether a given factual dispute is `material' for summary judgment purposes, we may not review whether a dispute of fact identified by the district court is `genuine.'" Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir.2004) (internal citation omitted).
 
 
 19
 Qualified immunity "shields police officers acting in their official capacity from suits for damages ... unless their actions violate clearly-established rights of which an objectively reasonable official would have known." Thomas v. Roach, 165 F.3d 137, 142 (2d Cir.1999). This is a doctrine that seeks to balance the twin facts that civil actions for damages may "offer the only realistic avenue for vindication of constitutional guarantees," and that such suits nevertheless "can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (internal citation omitted); Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir.1949) (Hand, J.) ("There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative.").
 
 
 20
 The Supreme Court has established a two-part inquiry to determine when a district court should hold that the doctrine of qualified immunity bars a suit against government officials: (1) the court must first consider whether the facts alleged, when taken in the light most favorable to the party asserting the injury, demonstrate a violation of a constitutional right, Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); and (2) the court must then consider whether the officials' actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known," Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).
 
 
 21
 Defendants have assumed, for the purposes of this appeal that "as a threshold matter, plaintiffs have shown a deprivation of a constitutional right." We need only, therefore, concern ourselves with the second part of the qualified immunity inquiry — the determination whether "[t]he contours of the right [allegedly violated are] sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." Anderson, 483 U.S. at 640, 107 S.Ct. 3034; Luna v. Pico, 356 F.3d 481, 490 (2d Cir.2004) ("[E]ven assuming a state official violates a plaintiff's constitutional rights, the official is protected nonetheless if he objectively and reasonably believed that he was acting lawfully."). Finally, we are mindful that the right at issue in a qualified immunity case need not be limited to the specific factual situation in which that right was articulated. Indeed, "the Supreme Court has declined to say that `an official action is protected by qualified immunity unless the very action in question has previously been held unlawful,' and has, instead, chosen a standard that excludes such immunity if `in the light of pre-existing law the unlawfulness [is] apparent.'" Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 129 (2d Cir.2004) (quoting Hope, 536 U.S. at 739, 122 S.Ct. 2508).
 
 A. The First Amendment
 
 22
 The First Amendment declares in part that "Congress shall make no law ... abridging the freedom of speech ... or the right of the people peaceably to assemble." U.S. Const. amend. I. The Amendment embodies and encourages our national commitment to "robust political debate," Hustler Magazine v. Falwell, 485 U.S. 46, 51, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), by protecting both free speech and associational rights. See, e.g., id. (freedom of speech); NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460-61, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (freedom of association); De Jonge v. Oregon, 299 U.S. 353, 364, 57 S.Ct. 255, 81 L.Ed. 278 (1937) ("The right of peaceable assembly is a right cognate to ... free speech and ... is equally fundamental.").
 
 
 23
 The Supreme Court has declared that the First Amendment protects political demonstrations and protests — activities at the heart of what the Bill of Rights was designed to safeguard. See Boos v. Barry, 485 U.S. 312, 318, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (calling organized political protest "classically political speech" which "operates at the core of the First Amendment"). Indeed, the Court has repeatedly held that police may not interfere with orderly, nonviolent protests merely because they disagree with the content of the speech or because they simply fear possible disorder. See Cox v. Louisiana, 379 U.S. 536, 550, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) ("Cox I") (noting that "constitutional rights may not be denied simply because of hostility to their assertion or exercise" and overturning convictions of individuals protesting arrest of civil rights activists) (quoting Watson v. City of Memphis, 373 U.S. 526, 535, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963) (internal quotation marks omitted)); Edwards v. South Carolina, 372 U.S. 229, 237, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) (political protest speech is protected even though it invites dispute and may stir people to anger). First Amendment protections, furthermore, are especially strong where an individual engages in speech activity from his or her own private property. See, e.g., City of Ladue v. Gilleo, 512 U.S. 43, 58, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (striking down a city ordinance that banned nearly all residential signs, noting that "[a] special respect for individual liberty in the home has long been part of our culture and our law" and "has special resonance when the government seeks to constrain a person's ability to speak there") (emphasis in original).
 
 
 24
 That said, First Amendment protections, while broad, are not absolute. Regan v. Boogertman, 984 F.2d 577, 579 (2d Cir.1993) (citing Elrod v. Burns, 427 U.S. 347, 360, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)). It is axiomatic, for instance, that government officials may stop or disperse public demonstrations or protests where "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears." Cantwell v. Connecticut, 310 U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Indeed, where a public gathering threatened to escalate into racial violence and members of a hostile crowd began voicing physical threats, the Supreme Court expressly sanctioned police action that ended the demonstration and arrested the speaker, who defied police orders to cease and desist. Feiner v. New York, 340 U.S. 315, 317-21, 71 S.Ct. 303, 95 L.Ed. 295 (1951). The police, the Court reasoned, were not "powerless to prevent a breach of the peace" in light of the "imminence of greater disorder" that the situation created. Id. at 321, 71 S.Ct. 303.
 
 
 25
 
 1) Plaintiffs' Free Speech Rights Were Clearly Established.
 
 
 
 26
 Defendants concede that plaintiffs had a constitutional right to protest but instead argue that the contours of the right were not sufficiently clear because of the absence of "decisional law supporting the existence of a right to continue with a demonstration after some of the participants create a public safety hazard." While we recognize that to be clearly established, the right "must have been recognized in a particularized rather than a general sense," Sira v. Morton, 380 F.3d 57, 81 (2d Cir.2004), we disagree for the reasons that follow with defendants' contention that the right at issue in this case was too general to be clearly established.
 
 
 27
 Defendants misapprehend the nature of the inquiry here. They essentially argue that we should find qualified immunity unless a Supreme Court or Second Circuit case expressly denies it, but that standard was rejected by the Supreme Court in favor of one in which courts must examine whether in "the light of pre-existing law the unlawfulness [is] apparent." Back, 365 F.3d at 129 (quoting Hope, 536 U.S. at 739, 122 S.Ct. 2508). As we established in the previous section, the Supreme Court has long applied the "clear and present danger" test to protest cases to determine when police interference is constitutional. Moreover, although defendants make much of the fact that some demonstrators had allegedly violated the law, transforming the peaceful demonstration into a potentially disruptive one, the Supreme Court has expressly held that "[t]he right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected." NAACP v. Claiborne Hardware Co., 458 U.S. 886, 908, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). Were we to accept defendants' view of the First Amendment, we see little that would prevent the police from ending a demonstration without notice for the slightest transgression by a single protester (or even a mere rabble rouser, wholly unconnected to the lawful protest). We see no need to deviate from the "clear and present danger" analysis as established by the Supreme Court.[3]
 
 
 28
 In the protest context, the Supreme Court has already well articulated the contours of the right and made clear that the police may not interfere with demonstrations unless there is a "clear and present danger" of riot, imminent violence, interference with traffic or other immediate threat to public safety. Cantwell, 310 U.S. at 308-309, 60 S.Ct. 900 (finding no imminent violence where anti-Catholic diatribe angered listener and provoked suggestion of violence). Neither energetic, even raucous, protesters who annoy or anger audiences, nor demonstrations that slow traffic or inconvenience pedestrians, justify police stopping or interrupting a public protest. Cox I, 379 U.S. at 546-47, 549 n. 12, 85 S.Ct. 453 (group of protesters who provoked a visceral, angered response and slowed traffic did not jeopardize their speech rights); Edwards, 372 U.S. at 232, 237, 83 S.Ct. 680 ("clear and present danger" means more than annoyance, inviting dispute or slowing traffic).
 
 
 29
 Plaintiffs allege that they posed no "clear and present danger" of immediate harm or violence at the time the police arrested them. Plaintiffs also allege that they made no threats of physical harm to police or members of the public, did not incite violence or disorder and displayed no dangerous weapons. See Cox I, 379 U.S. at 546-47, 85 S.Ct. 453. They claim instead to have gathered on private property to exercise their speech rights peaceably, see Ladue, 512 U.S. at 58, 114 S.Ct. 2038, a fact that the police knew (because they had monitored the protest from May 8) and implicitly condoned. Members of the protest had even attempted to speak to the NYSP to let them know of their intentions, but the troopers ignored them. Finally, plaintiffs contend that only a few protesters demonstrated on the Interstate; that their activities did not affect the peaceful tenor of the main protest; and that the few protesters who did enter the highway desisted from their conduct before the police broke up the demonstration. Taken as a whole, the facts as alleged by plaintiffs reveal an orderly, peaceful crowd, the overwhelming majority of whose members had not entered the I-81 roadway. Given the above, it is clear to this Court that a reasonable factfinder could determine under plaintiffs' version of events that the demonstration did not constitute a "clear and present danger" and thus that the NYSP's actions violated a clearly established constitutional right to protest.
 
 
 30
 
 2) No objectively reasonable officer would have believed that he or she could have as a matter of law dispersed the demonstration under plaintiffs' facts.
 
 
 
 31
 Even if the protesters' First Amendment rights in this case are clearly established, defendants argue that an objectively reasonable officer would not have known that his dispersal of the demonstration was unlawful because the demonstration "had transformed from a peaceful gathering into one posing a clear and present danger to public safety, ... that was harboring several unidentified persons who had just committed ... criminal offense[s]." Defendants contend that through that lens, the facts, even as asserted by plaintiffs, required the district court to have granted them summary judgment as a matter of law. We disagree.
 
 
 32
 We have already concluded that we cannot say as a matter of law that under plaintiffs' facts, their actions presented a "clear and present" danger or immediate harm such that a reasonable officer would have believed he or she could have dispersed the protest. We are mindful that the First Amendment does not insulate individuals from criminal sanction merely because they are simultaneously engaged in expressive activity. See Cox I, 379 U.S. at 554, 85 S.Ct. 453 ("One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest."). Defendants have alleged that it was reasonable for them to disperse the crowd after members of the crowd had committed crimes on the public highway. As the district court noted, however, there remain questions of material fact regarding whether defendants' purported bases for dispersing the crowd — that some protestors had violated state law that forbids unlawful assembly, N.Y. Penal Law § 240. 10, and disorderly conduct, N.Y. Penal Law § 240.20(5) — actually justified their actions. Indeed, under plaintiffs' facts, it is clear that plaintiffs had not violated the law forbidding unlawful assembly. It is equally clear that a serious issue remained as to whether the protesters had engaged in disorderly conduct and whether even if some had, the police could identify those who had entered the roadway in contravention of the disorderly conduct statute. We examine each law in turn as well as the evidence relating to the alleged violation of that law.
 
 
 33
 Section 240.10 of the Penal Law states that four or more persons assembled for purposes of engaging in violent and tumultuous conduct likely to cause public alarm constitutes an unlawful assemblage. N.Y. Penal Law § 240.10. Conviction under this law requires "an incitement which is both directed towards and likely to produce imminent violent and tumultuous conduct." Jones, 2005 WL 928667, at * 10 (citation omitted). Plaintiffs acknowledge that some protesters entered the roadway to distribute literature to passing motorists. The facts plaintiffs allege, however, show no incitement to, or threat of, imminent violence and they deny that they were involved in, or intended, such conduct. We therefore cannot say that a reasonable police officer would as a matter of law have believed that anyone in the crowd had violated this law or that this law gave him or her the right to disperse the demonstrators.[4]
 
 
 34
 Section 240.20(5) of the Penal Law states that "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, [h]e [or she] obstructs vehicular or pedestrian traffic." N.Y. Penal Law § 240.20(5). New York courts have interpreted this statute to permit punishment only where the conduct at issue does more than merely inconvenience pedestrian or vehicular traffic. People v. Pearl, 66 Misc.2d 502, 321 N.Y.S.2d 986, 987 (1st Dep't 1971) ("Something more than the temporary inconvenience caused to pedestrians by the demonstrators' blocking of the west crosswalk, requiring them to enter the roadway to get to the other side, was required to sustain a conviction for obstructing pedestrian traffic."); see also People v. Nixon, 248 N.Y. 182, 185, 187, 161 N.E. 463 (1928) (overturning disorderly conduct conviction where protesters who occupied the entire sidewalk forced pedestrians out into the street), overruled on other grounds by People v. Santos, 86 N.Y.2d 869, 871, 635 N.Y.S.2d 168, 658 N.E.2d 1041 (1995). There is, then, a serious question of fact whether the protesters, who allege that they merely walked onto the Interstate to distribute leaflets explaining their protest, had the intent to obstruct or in fact obstructed traffic in such manner as to have violated state law. Assuming, arguendo, that the individuals who protested on I-81's roadway had violated § 240.20, an issue of fact also nevertheless exists as to whether a reasonable police officer would have believed that he or she could disperse the otherwise peaceable demonstration because a few individuals within that crowd had violated the law at an earlier time and desisted before the dispersal. This is especially the case where, as here, the officers concede for purposes of this appeal that "[n]one of the troopers could identify any person at the gathering as having been on the road." Defendants could not, then, have reasonably thought that indiscriminate mass arrests without probable cause were lawful under these circumstances. See United States v. Perea, 986 F.2d 633, 642-43 (2d Cir.1993) ("A warrantless arrest is unlawful absent probable cause."). Without the ability to identify those individuals who had entered the I-81 roadway, defendants cannot rely on § 240.20 to justify their actions.
 
 
 35
 Quite simply, on the facts alleged, we cannot say as a matter of law that the police had an objectively reasonable basis to conclude that the plaintiffs presented a clear and present danger of imminent harm or other threat to the public at the time of the arrests. Defendants were accordingly not entitled to qualified immunity.
 
 
 36
 
 3) The absence of a dispersal order violated First Amendment rights.
 
 
 
 37
 Plaintiffs' facts, as alleged, would also give rise to a separate First Amendment violation even if the NYSP had a lawful basis to interfere with the demonstration. Indeed, while defendants repeatedly invoke the need to disperse the crowd as their coup de grâce — even claiming that "dispersal [is] the essence of plaintiffs' First Amendment claims" — they completely ignore an important predicate of their defense: the order to disperse. Here, defendants concede that they issued no dispersal order and instead stood in a "skirmish line," waited thirty-five seconds, and then charged into the crowd, arresting protesters indiscriminately.[5] They further concede that most demonstrators (including many, if not all, of the plaintiffs) had not ventured out onto the Interstate and that they could not identify any of the demonstrators who had. As we noted earlier, plaintiffs had an undeniable right to continue their peaceable protest activities, even when some in the demonstration might have transgressed the law. Claiborne Hardware, 458 U.S. at 908, 102 S.Ct. 3409. Plaintiffs still enjoyed First Amendment protection, and absent imminent harm, the troopers could not simply disperse them without giving fair warning. City of Chicago v. Morales, 527 U.S. 41, 58, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) ("[T]he purpose of the fair notice requirement [in disorderly conduct statutes] is to enable the ordinary citizen to conform his or her conduct to the law."); Feiner, 340 U.S. at 321, 71 S.Ct. 303 (finding no First Amendment violation where imminence of disorder was "coupled with petitioner's deliberate defiance of the police" and their orders to disperse); N.Y. Penal Law § 240.20(6) (failure to heed lawful police order to disperse gathering in public place constitutes disorderly conduct); accord Dellums v. Powell, 566 F.2d 167, 181 n. 31 (D.C.Cir.1977) (Where "[t]he record ... indicates that not all of the arrestees were violent or obstructive or noisy ... [and] only a small minority of the demonstrators were involved in any mischief," notice and time to comply with a dispersal order is required.).[6] To the extent there was no imminent harm, plaintiffs' version of facts does not give rise to circumstances that would have suggested police need not have given a dispersal order as a matter of law.
 
 
 38
 In the end, the district court properly concluded that the facts as alleged by plaintiffs demonstrate that defendants violated plaintiffs' clearly established First Amendment rights "of which a reasonable person would have known." Hope, 536 U.S. at 739, 122 S.Ct. 2508. Accordingly, defendants are not entitled to qualified immunity as a matter of law on plaintiffs' First Amendment claim.
 
 B. The Fourth Amendment
 
 39
 The Fourth Amendment protects individuals from the government's use of excessive force when detaining or arresting individuals. See Thomas, 165 F.3d at 143. When determining whether police officers have employed excessive force in the arrest context, the Supreme Court has instructed that courts should examine whether the use of force is objectively unreasonable "in light of the facts and circumstances confronting them, without regard to [the officers'] underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The touchstone of the inquiry, then, is reasonableness, and in measuring it, "we consider the facts and circumstances of each particular case, including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest." Thomas, 165 F.3d at 143. We are, of course, mindful that the reasonableness inquiry does not allow us to substitute our own viewpoint; we must judge the officer's actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396, 109 S.Ct. 1865, 104 L.Ed.2d 443. Indeed, the Supreme Court has cautioned that in analyzing excessive force claims, courts must make "allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." Id. at 397, 109 S.Ct. 1865.
 
 
 40
 At the outset, defendants argue that the district court did not apply the reasonableness test as announced in Graham in evaluating whether they were entitled to qualified immunity on plaintiffs' excessive force claims, but rather examined only whether defendants had probable cause to arrest plaintiffs. The court's analysis was based, defendants contend, on a misreading of this Court's decision in Atkins v. New York City, 143 F.3d 100 (2d Cir.1998). The court below appears to have extrapolated from Atkins the legal proposition that "unless State Defendants had probable cause for the arrests that they made, any force that they used in making those arrests was excessive." Jones, 2005 WL 928667, at *9. Because factual questions regarding whether the NYSP had probable cause to arrest defendants remained in dispute, the court denied summary judgment on plaintiff's excessive force claims. Defendants claim that given this misreading of Atkins, the district court's analysis was flawed and the issue of qualified immunity for plaintiffs' excessive force claim should be remanded for determination under the reasonableness test.
 
 
 41
 There has been disagreement among the lower courts about the breadth and scope of our Atkins decision.[7] In that case, the jury returned a verdict in favor of the plaintiff on both his excessive force and false arrest claims and awarded him $1 in nominal damages, but nothing in compensatory damages despite the undisputed fact that plaintiff had been hurt during the arrest. Atkins, 143 F.3d at 102. The Court determined that Atkins would be entitled to compensatory damages for his excessive force claim only if he could prove that his "injuries were proximately caused by the constitutional violation." Id. at 103. Because "there was never a moment when force applied by [the police officer] could have been found to be lawful," given the jury's verdict on excessive force and false arrest, this Court reasoned, Atkins was entitled to some amount of compensatory damages for his injuries. Id. In explaining this reasoning, the Court suggested that "if the jury believed Atkins started to swing at [the officer] (for which he was arrested), the force used in connection with the arrest was unlawful because the arrest was found to be unlawful." Id.
 
 
 42
 This latter sentence has engendered undue confusion. See supra at n. 7. The issue in Atkins was the incongruity between the jury verdict and the damages awarded. Given the jury's determination that Atkins did not use force sufficient to justify the police using force against him and that he had in fact suffered injuries during his encounter with the police, the primary and necessary holding in our decision was that Atkins' injuries were at least in part proximately caused by the unconstitutional application of force by the police. As such, Atkins was entitled to some award of compensatory, rather than nominal, damages. There was accordingly no need for this Court in Atkins to reach the question of whether any force used in an arrest lacking probable cause is per se excessive. Such a construction would read the highly fact-specific situation in which Atkins arose too broadly because it would appear to suggest that any force employed by a police officer would be unlawful so long as probable cause did not exist, even if the detainee had threatened the officer with significant harm. We are further mindful that the Supreme Court held in Graham that "all claims that law enforcement officers have used excessive force ... should be analyzed under the ... `reasonableness' standard" of the Fourth Amendment, thereby establishing a general requirement. 490 U.S. at 395, 109 S.Ct. 1865 (emphasis in original). The Atkins court clearly did not intend to create or substitute a new standard for arrests lacking probable cause, and the reasonableness test established in Graham remains the applicable test for determining when excessive force has been used, including those cases where officers allegedly lack probable cause to arrest.
 
 
 43
 This Court has remanded cases where a district court failed to reach an issue of qualified immunity, see Francis v. Coughlin, 849 F.2d 778, 780 (2d Cir.1988), but we have also addressed the merits of the issue itself on appeal, especially "where the record plainly reveals the existence of genuine issues of material fact relating to the qualified immunity defense." Hurlman v. Rice, 927 F.2d 74, 82 (2d Cir.1991). Because the extensive factual record reveals that material issues already exist concerning the excessive force claims which the district court did not dismiss,[8] we see no reason to remand this issue here, where as a matter of law, defendants would not be entitled to qualified immunity on the facts as alleged by plaintiffs.
 
 
 44
 Because no party has contested that plaintiffs' version, if true, would establish a constitutional deprivation, our analysis on the qualified immunity defense for the excessive force claim rests solely on the reasonableness of defendants' actions. Under plaintiffs' view of the record, the State troopers indiscriminately arrested some, but not all, plaintiffs and broke up the May 18 demonstration on private property; in the course of these actions, they allegedly employed excessive force against certain plaintiffs, some of whom were arrested and some of whom were not. Our review of the record shows that each plaintiff who has brought an excessive force claim has alleged sufficient facts from which a reasonable factfinder could find that the NYSP employed excessive force in arresting and dispersing members of the demonstration. For example, plaintiffs allege that without provocation, the NYSP threw several plaintiffs to the ground, including an eleven-year-old girl and an elderly medicine woman; beat various plaintiffs with batons; kicked and punched several of them; and pushed at least one man, who was praying, to the ground and choked him.
 
 
 45
 In sum, after conducting a de novo review, we hold that the district court's ultimate determination in denying defendants' motion for summary judgment on the excessive force claims was correct despite its understandable reliance on dicta in Atkins.
 
 III. Qualified Immunity under State Law
 
 46
 The district court held that because "state law governs a defendant's entitlement to qualified immunity with respect to state-law claims, see Napolitano v. Flynn, 949 F.2d 617, 621 (2d Cir.1991) (citation omitted), and current New York law does not provide police defendants with a qualified immunity defense with respect to state-law claims, the Court may only consider the issue of qualified immunity with regard to Plaintiffs' federal-law claims." Jones, 2005 WL 928667, at *6 n. 8. New York law, however, does grant government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis. See Blouin ex rel. Estate of Pouliot v. Spitzer, 356 F.3d 348, 364 (2d Cir.2004) ("The New York courts recognize the defense of qualified immunity to shield the government official from liability unless that action is taken in bad faith or without a reasonable basis."); Arteaga v. State, 72 N.Y.2d 212, 216-17, 532 N.Y.S.2d 57, 527 N.E.2d 1194 (1988). The district court thus erred in holding the contrary.
 
 
 47
 Plaintiffs do not attempt to defend the district court's interpretation of New York law, but rather contend that "[e]ven if the [qualified immunity] defense did apply to Plaintiffs' state claims, defendants' defense would necessarily depend on the same `reasonableness' at issue with respect to Plaintiffs' federal claims." We agree.
 
 
 48
 As with our determination on defendants' assertion of qualified immunity on plaintiffs' excessive force claims, we see no reason to remand where, as here, "the record plainly reveals the existence of genuine issues of material fact relating to the qualified immunity defense." Hurlman, 927 F.2d at 82. New York courts are no different in this regard. Simpkin v. City of Troy, 224 A.D.2d 897, 638 N.Y.S.2d 231, 232 (3d Dep't 1996) ("Clearly, without a factual resolution of the sharply conflicting versions of these events, it is not possible to determine whether defendants are qualifiedly immune."); Hayes v. City of Amsterdam, 2 A.D.3d 1139, 770 N.Y.S.2d 138, 141 (3d Dep't 2003) (same).
 
 
 49
 Plaintiffs' remaining state-law claims focus on the reasonableness of the State troopers in arresting and detaining them, including whether the defendants' actions resulted in false arrest and imprisonment, malicious prosecution, assault, battery or the intentional or negligent infliction of emotional distress. The resolution of these claims rests heavily on the same facts that form the heart of the federal claims. For instance, under New York law, qualified immunity in the context of a claim of false arrest depends on whether it was objectively reasonable for the police to believe that they had probable cause to arrest. Simpkin, 638 N.Y.S.2d at 232; see also Boyd v. City of New York, 336 F.3d 72, 75 (2d Cir.2003). This question was at the center of the district court's Fourth Amendment excessive force analysis, see Jones, 2005 WL 928667, at *9-*12, and that court's conclusions were correct: the numerous disputed material facts precluded the grant of qualified immunity. This analysis also applies to, and controls, the qualified immunity questions presented under New York law.
 
 
 50
 Because the remaining state-law claims present similar unresolved issues, we need not remand the state-law qualified immunity question here.
 
 
 51
 IV. Pendant Jurisdiction over Plaintiffs' Cross-Appeal
 
 
 52
 Having dealt with the merits of defendants' appeal, we turn now to plaintiffs' cross-appeal. Plaintiffs ask this Court to exercise pendent jurisdiction over a number of claims, including the dismissal of their First Amendment conspiracy, equal protection and Fourth Amendment false arrest and imprisonment claims; the grants of summary judgment to defendants Walsh and NYSP Superintendent McMahon; the sua sponte rulings dismissing all claims against Onondaga County, its Sheriff's Department, and NYSP troopers Bender and Obrist; and the grant of summary judgment to all defendants with respect to plaintiffs Marissa Horton and Verna Montour's excessive force claims. Under the collateral order doctrine, "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law [and not of fact], is an appealable `final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). When we take such an appeal, we may exercise pendent jurisdiction over other issues that are not ordinarily subject to interlocutory review only when: (1) they are "inextricably intertwined" with the determination of qualified immunity; or (2) their resolution is "necessary to ensure meaningful review" of the district court's ruling on qualified immunity. Swint v. Chambers County Comm'n, 514 U.S. 35, 51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995); see also id. at 4, 115 S.Ct. 12039 (cautioning that "a rule loosely allowing pendent appellate jurisdiction would encourage parties to parlay [appealable] collateral orders into multi-issue interlocutory appeal tickets"). Finally, we are mindful that "[p]endent appellate jurisdiction is a procedural device that rarely should be used because of the danger of abuse" and that accordingly, we must exercise such jurisdiction "[o]nly in exceptional circumstances." Natale v. Town of Ridgefield, 927 F.2d 101, 104 (2d Cir.1991) (citation omitted).
 
 
 53
 Each finding on which plaintiffs seek to cross appeal involves issues entirely separate and distinct from the qualified immunity analysis at issue here, including the district court's determinations on the subjective intent in plaintiffs' conspiracy claims, see Crawford-El v. Britton, 523 U.S. 574, 588, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (articulating a "single objective standard" for evaluating qualified immunity and stating that "[e]vidence concerning the defendant's subjective intent is simply irrelevant to that defense"); on plaintiffs' failure properly to include defendants in their captions; on claims of parties who are not before this court on appeal, see Kaluczky v. City of White Plains, 57 F.3d 202, 207 (2d Cir.1995) ("[A] claim involving a `pendent party' is an `unrelated question' that cannot be resolved under pendent jurisdiction."); and on issues of respondeat superior and supervisor liability, see Swint, 514 U.S. at 51, 115 S.Ct. 1203 (finding no pendent jurisdiction over county commission's appeal where "[t]he individual defendants' qualified immunity turns on whether they violated clearly established federal law [while] the county commission's liability turns on the allocation of law enforcement power in Alabama"). Thus, we have no jurisdiction over plaintiffs' cross-appeal because there are no issues before us "inextricably intertwined" with our qualified immunity analysis.
 
 CONCLUSION
 
 54
 For the foregoing reasons, we AFFIRM the judgment of the district court denying qualified immunity and DISMISS plaintiffs' cross-appeal for lack of jurisdiction.
 
 
 
 Notes:
 
 
 [1]
 As the district court correctly noted, it is a material issue of fact which, if any, of the plaintiffs actually entered the roadwayJones, 2005 WL 928667, at * 11. It is undisputed that the majority of people at the demonstration did not enter the roadway.
 
 
 [2]
 The Onondagas allege that this hostility was due in part to an earlier and unrelated incident in which Native American demonstrators injured several NYSP troopers during a protest in Buffalo
 
 
 [3]
 This approach would still provide police officers ample authority in certain circumstances to stop or prevent demonstrations that had turned, or threatened to turn, unduly disruptive or violent
 
 
 [4]
 As plaintiffs note, both sections of the Penal Law were considered and rejected by Justices Miller and Burke when they dismissed the State's charges against some of the plaintiffs for alleged misconduct during the May 18 demonstration
 
 
 [5]
 The NYSP argues that they confronted a situation of imminent harm. As we have repeatedly stated, however, our limited appellate jurisdiction here precludes us from viewing the facts as defendants assert them. We thus have no occasion to determine whether police would be permitted to disperse without warning a crowd more akin to a mob than the peaceful protest plaintiffs describe
 
 
 [6]
 In some cases, the Supreme Court has recognized that even an order to disperse would not divest demonstrators of their right to protest. InCox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) ("Cox II"), the police knew of and explicitly permitted a civil rights demonstration to gather near the municipal courthouse. Minutes after the protest had started, however, officials attempted to disperse the crowd and arrested those who did not comply with the order. The Cox II court reversed the convictions of those arrested, noting "it is clear that the dispersal order did not remove the protection accorded appellant by the original grant of permission." Id. at 573, 85 S.Ct. 476.
 
 
 [7]
 Compare Zellner v. Summerlin, 399 F.Supp.2d 154, 164 (E.D.N.Y.2005) (finding no bright-line rule in Atkins that any force used in an arrest that lacked probable cause is excessive) with Frobel v. County of Broome, 419 F.Supp.2d 212, 220 (N.D.N.Y.2005) ("Any force used in effecting an unlawful seizure of the person is considered excessive and unlawful."); Black v. Town of Harrison, No. 02 Civ.2097, 2002 WL 31002824, at *6 (S.D.N.Y. Sept. 5, 2002) (same); LaLonde v. Bates, 166 F.Supp.2d 713, 719 (N.D.N.Y. 2001) (same); Scott v. Sinagra, 167 F.Supp.2d 509, 515 (N.D.N.Y.2001) (same).
 
 
 [8]
 The district court dismissed plaintiffs Marissa Horton and Verna Montour's excessive force claims in its March 28 decisionJones, 2005 WL 928667, at *1 n. 1, reconsideration denied, 2005 WL 928666, at *2 (N.D.N.Y. Apr.20, 2005).