Katzmann, Chief Judge:
*529 This appeal arises out of the New York Police Department's ("NYPD" or "Department") response to a December 2014 protest in Manhattan. The six individual plaintiffs allege that Lieutenant John Maguire and Officer Mike Poletto ("defendants") violated their Fourteenth Amendment rights by using a long-range acoustic device ("LRAD"), also known as a "sound gun," to compel them and other non-violent protesters to exit the street. The district court held that the plaintiffs adequately alleged an excessive force violation and, accepting the allegations as true, that the defendants were not entitled to qualified immunity. This case comes to us on an interlocutory appeal from that order.
We, like the district court, consider only the factual allegations in the complaint and the videos it incorporates. With this limitation, we are compelled to affirm the denial of qualified immunity. In a narrow ruling, we hold that purposefully using a LRAD in a manner capable of causing serious injury to move non-violent protesters to the sidewalks violates the Fourteenth Amendment under clearly established law. At the same time, recognizing that the complaint before us provides only the vantage point of the plaintiffs, we caution that once both sides present evidence-especially about what the officers observed and knew-the defendants may yet be entitled to qualified immunity.
BACKGROUND
I. Factual History
On an interlocutory appeal from the denial of qualified immunity, our jurisdiction is limited to deciding whether, based on facts alleged by the plaintiffs or stipulated to by the parties, "the immunity defense is established as a matter of law." Salim v. Proulx , 93 F.3d 86, 90 (2d Cir. 1996). For purposes of this appeal, the defendants accept as true the allegations set forth in this factual history.
A. LRAD Technology and the NYPD
LRADs are acoustic weapons developed for the U.S. military in the wake of the deadly terrorist attack on the USS Cole in 2000. "If mounted aboard a Navy ship, the device's loudspeaker could be used to 'warn off' boats that came too close. If those warnings are ignored, the device could be used to send out sound at a dangerously high level ... to cause pain/hearing damage to try to repel the attack." First Amended Complaint ("FAC") ¶ 11. This technique, known as "area denial," has been used in both military and crowd control settings. Id.
An LRAD can produce louder sound than a traditional amplification device, such as a megaphone, and can project over much greater distances. To achieve this effect, LRADs concentrate sound into a 30- to 45-degree cone-shaped beam. They also reshape acoustic energy to produce flatter sound waves that (1) reduce dampening as the wave travels and (2) interact with the air to create additional frequencies within the wave. Alex Pasternack, The New Sound of Crowd Control , Motherboard (Dec. 17, 2014), https://motherboard.vice.com/en_us/article/qkve7q/the-new-sound-of-crowd-control (last accessed Mar. 11, 2018). This can produce volumes of up to 146 decibels. For context, the threshold for human discomfort begins between 120 and 140 decibels and the National Institute of Health cautions that hearing loss can result from short exposure to sounds at or above 110 to 120 decibels.
The New York Police Department purchased two Model 3300 LRADs before the *530 2004 Republican National Convention in New York City. Like other LRADs, the Model 3300 has two functions. One, it can serve as a "loudspeaker" to broadcast police commands over vast distances. And, two, the "area denial" function can "propel piercing sound at higher levels ... than are considered safe to human ears." App. at 85. According to a Department representative speaking at the time of the Convention, the LRADs were purchased to direct crowds to safety in the event of a calamity.
Following the convention, the NYPD used its LRADs sporadically and, then, mainly as loudspeakers. In 2010, the NYPD's Disorder Control Unit tested the Model 3300 at an empty parking lot in the Bronx. Measured from 320 feet away, the spoken voice commands registered at 102 decibels and the area denial mode at 110 decibels. The Department did not take readings within the 320-foot range, which it described as a "potential danger area." A report analyzing the test results observed that, in the "dangerous range (above 120 decibels), this device can cause damage to someone's hearing and may be painful." FAC ¶ 11.
Shortly thereafter, the NYPD purchased the more portable Model 100X, which also has loudspeaker and area denial functions. The 100X's product sheet boasts that it has a maximum volume of 136 decibels at one meter and the manufacturer guidelines caution not to use it within 10 to 20 meters of people. A diagram on the 100X's control panel shows a red beam emanating from the front of the device and instructs: "DO NOT ENTER WITHIN 10 METERS DURING CONTINUOUS OPERATION." Id. ¶ 25.
B. The Protest
On December 3, 2014, a Staten Island grand jury declined to indict the NYPD officer who placed Eric Garner, an unarmed black man, in a fatal chokehold. The next day, protests arose across the nation. In Manhattan, hundreds took to the streets to denounce police brutality. The plaintiffs, many of whom are activists and journalists, participated in and documented the protest. Over the course of the evening and into the pre-dawn hours, the demonstrators marched across the city, escorted by NYPD officers.
Sometime after 1:00 a.m., as the protest crossed through the intersection of 57th Street and Madison Avenue, officers made several arrests. Videos of the scene (which are incorporated into the complaint) show a crowd-cordoned off from the arrests by a chain of officers-gathered in a semicircle to observe. Unable to proceed through the intersection, cars idled in the street as protesters streamed past. Meanwhile, many onlookers inched closer to take photographs only to be waved off by officers or told to "get back." Although some demonstrators demanded that the officers "let [the arrestees] go," none interfered with the arrests. Several plaintiffs reported hearing what sounded like a glass bottle breaking, but it did not appear to strike or injure anyone.
Then, with no warning, NYPD officers discharged pepper spray. Several plaintiffs who had been watching the arrests began to flee. Seconds later the wail of a high-pitched alarm began pulsing though the streets. The defendants had activated the LRAD's area denial function. According to plaintiffs, they had not been ordered to disperse and no such order is audible on the video.
After several bursts from the alarm tone, Lieutenant Maguire and Officer Poletto, both members of the Disorder Control Unit, began broadcasting commands. One officer held the briefcase-sized device in front of him while the other trailed *531 behind and spoke into a corded microphone. "[T]his is the New York City Police Department. You must not interfere with vehicular traffic. You must remain on the sidewalk. If you do interfere with vehicular traffic, you will be placed into custody." Video 1 at 3:23-3:41. Variants of this refrain, punctuated by alarm tones, were repeated for about three minutes as the officers walked the length of 57th Street between Madison and Park Avenues. Although many people in the LRAD's path "were already fleeing on the sidewalks," the officers followed close on their heels, sometimes from fewer than ten feet. FAC ¶ 124. Plaintiffs maintain that the defendants "knew or should have known that the use of the LRAD could cause permanent hearing damage and other injury." Id. ¶ 130.
In the days and weeks following the protest, each plaintiff reported physical injuries. Many claimed that they experienced significant ear pain, prolonged migraines, vertigo, and ringing in the ears. Most sought medical treatment. One plaintiff "had extreme difficulty with his hearing." Id. ¶ 370. His doctor explained that "the pressure of the extreme level of the noise from the LRAD had pushed a bone in his ear inwards, impacting and damaging a nerve in his ear." Id. ¶ 372. His hearing improved after a course of steroidal medication. Several plaintiffs allege that they are now afraid to attend protests, which, for some, has harmed their professional opportunities as journalists.
II. Procedural History
In March 2016, the six plaintiffs sued Lieutenant Maguire and Officer Poletto, as well as then-NYPD Commissioner William Bratton and the City of New York. They asserted claims under 42 U.S.C. § 1983 premised on violations of the First, Fourth, and Fourteenth Amendments, as well as related municipal liability and New York state law claims. Defendants moved to dismiss the amended complaint, arguing that plaintiffs had failed to state a claim and that the officers were entitled to qualified immunity.
The motion was granted in part and denied in part. The district court found that plaintiffs had adequately pleaded excessive force in violation of the Fourteenth Amendment (as well as the related municipal liability claim) and denied defendants qualified immunity. It also permitted the state-law assault and battery claims to proceed, including the claims against the City under a theory of respondeat superior . The district court dismissed the other claims, including all claims against Commissioner Bratton.
On the Fourteenth Amendment claim, the district court reasoned that "[t]he use of the [Model 100X] as a projector of powerfully amplified sound is no different than other tools in law enforcement's arsenal that have the potential to be used either safely or harmfully," such as stun grenades. Special App. at 16. As to qualified immunity, the district court rejected defendants' argument that amplified noise did not constitute unconstitutional force under existing precedent. "[T]here is much case law discussing the need for careful, vicinity-specific considerations when using tools like distraction devices," the court explained, and, if the circumstances were as plaintiffs allege, these analogous cases would have informed the officers of the illegality of their actions. Id. at 21.
Lieutenant Maguire and Officer Poletto timely filed this interlocutory appeal.
DISCUSSION
I. Appellate Jurisdiction and Standard of Review
The sole issue on appeal is whether defendants are entitled to qualified *532 immunity on the Fourteenth Amendment claim. Ordinarily a district court order denying a motion to dismiss is not appealable. See 28 U.S.C. § 1291. Yet the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant , 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam). This is because qualified immunity represents not simply a bar on liability but also an "entitlement not to stand trial or face the burdens of litigation." Mitchell v. Forsyth , 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Accordingly, denying qualified immunity "conclusively determines that the defendant[s] must bear the burdens of discovery; is conceptually distinct from the merits of the plaintiff[s'] claim; and would prove effectively unreviewable on an appeal from a final judgment." Ashcroft v. Iqbal , 556 U.S. 662, 672, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks and brackets omitted). It follows that, "[p]rovided it turns on an issue of law," the district court's denial of qualified immunity is a final reviewable order. Id. (internal quotation marks omitted).
"Of course, [by] presenting [their] immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment[, the defendants] must accept the more stringent standard applicable to this procedural route." McKenna v. Wright , 386 F.3d 432, 436 (2d Cir. 2004). Briefly summarized, we accept the complaint's factual allegations as true and draw all reasonable inferences in the plaintiffs' favor, including both those that support the claim and "those that defeat the immunity defense." Id. This standard represents a "formidable hurdle." Id. at 434. Because the facts are undisputed, our review is de novo . Johnson v. Newburgh Enlarged Sch. Dist. , 239 F.3d 246, 250 (2d Cir. 2001).
II. Qualified Immunity
Assured of our jurisdiction, we turn to the merits. Section 1983 establishes a private right of action for money damages against state officials, acting "under color" of law, who violate a constitutional or statutory right. 42 U.S.C. § 1983. This "deter[s] governmental abuse and remed[ies] unlawful governmental transgressions." Newburgh , 239 F.3d at 250. At the same time, "permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." Anderson v.Creighton , 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). To balance the need for accountability and the potential chilling effect, "the Supreme Court established qualified immunity as an affirmative defense to § 1983 claims." Newburgh , 239 F.3d at 250. This defense is designed to "reduce[ ] the general costs of subjecting officials to the risks of trial" by immunizing them from monetary liability "based on unsettled rights." Connell v. Signoracci , 153 F.3d 74, 79 (2d Cir. 1998) (internal quotation marks omitted).
Officers are entitled to qualified immunity "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd , 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (quoting Harlow v. Fitzgerald , 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ). Failure to establish either prong would resolve this case and we may "exercise [our] sound discretion in deciding which ... should be addressed first."
*533 Pearson v. Callahan , 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Like the district court, we begin with the first prong.
A. Fourteenth Amendment Violation
The right not to be subject to excessive force, perhaps most commonly associated with the Fourth and Eighth Amendments, can also arise under the Fourteenth. See Graham v. Connor , 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ; Hemphill v. Schott , 141 F.3d 412, 418 (2d Cir. 1998). This is because "[t]he touchstone of due process," which "is protection of the individual against arbitrary action of government," Wolff v. McDonnell , 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), bars "the exercise of power without any reasonable justification in the service of a legitimate governmental objective," Cty. of Sacramento v. Lewis , 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). When the government action is executive, rather than legislative, the Supreme Court has cautioned that "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." Lewis , 523 U.S. at 846, 118 S.Ct. 1708 (internal quotation marks omitted). This standard is most readily satisfied when conduct is "intended to injure in some way unjustifiable by any government interest." Id. at 849, 118 S.Ct. 1708.
While the parties agree that the Fourteenth Amendment establishes a right against excessive force, they disagree about the relevant test. Defendants maintain that the proper inquiry is whether the conduct shocks the conscience. Appellants' Reply Br. at 11. They argue that this standard includes a subjective element-whether the officers behaved "maliciously and sadistically for the very purpose of causing harm." Appellants' Br. at 33 (quoting Tierney v. Davidson , 133 F.3d 189, 196 (2d Cir. 1998) ). According to defendants, this standard is "distinct from, and more stringent than, objective reasonableness." Appellants' Reply Br. at 11. Plaintiffs counter that conduct shocks the conscience when the use of force was both "objectively unreasonable" and "intentional, as opposed to negligent." Appellees' Br. at 33. In addressing this disagreement, we apply the law as it exists at the time of decision. See Whitney v. Empire Blue Cross & Blue Shield , 106 F.3d 475, 477 (2d Cir. 1997) (per curiam).
Defendants are correct that many cases describe the test for excessive force under the Fourteenth Amendment with the shorthand "shocks the conscience." See, e.g. , Rochin v. California , 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952). For many years, courts have understood this standard to be distinct from the Fourth Amendment's prohibition against "unreasonable" government action. See Lewis , 523 U.S. at 842-43, 118 S.Ct. 1708. As recognized in Graham , this distinction reflects the varied sources of excessive force claims. 490 U.S. at 393-94, 109 S.Ct. 1865. Arrestees may invoke the Fourth Amendment's prohibition against "unreasonable" seizures. U.S. Const. amend. IV. Those incarcerated for a criminal conviction draw on the Eighth Amendment's ban on "cruel and unusual punishments." U.S. Const. amend. VIII. Meanwhile, pretrial detainees and non-incarcerated persons rely on the constitutional guarantee of "due process." U.S. Const. amends. V, XIV.
In Johnson v. Glick , this Court identified four illustrative factors for assessing whether conduct, in the words of Rochin , "shocks the conscience." 481 F.2d 1028, 1033 (2d Cir. 1973) (Friendly, J .) (quoting Rochin , 342 U.S. at 172, 72 S.Ct. 205 ). The factors are: "the need for the application of force, the relationship between the need and the amount of force that was used, the *534 extent of the injury inflicted, and whether the force was ... [inflicted] maliciously or sadistically." Id. In the decades since Glick was decided, these factors have continued to guide our Fourteenth Amendment excessive force analysis. See, e.g. , Tierney , 133 F.3d at 199. But they have never been exhaustive, nor is each factor necessary. See Glick , 481 F.2d at 1033 (stating only that "a court must look to such factors as ..."). In particular, we have never treated malice or sadism as a requirement for stating (or proving) an excessive force claim under a due process theory. Where officials lacked "any legitimate government objective and [caused] substantial injury," we have treated malicious or sadistic conduct as presumptively unconstitutional. Newburgh , 239 F.3d at 252. But we have also found excessive force under the Fourteenth Amendment without ever examining an officer's subjective intent. See, e.g. , Robison v. Via , 821 F.2d 913, 924 (2d Cir. 1987) ; Bellows v. Dainack , 555 F.2d 1105, 1106 & n.1 (2d Cir. 1977).
In 2015 (after the events at issue in this case) the Supreme Court revisited the Fourteenth Amendment standard in Kingsley v. Hendrickson , --- U.S. ----, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015). The question there was whether a pretrial detainee alleging a Fourteenth Amendment violation must prove that the officers were subjectively aware that the force was excessive, as in the Eighth Amendment context, or merely that the force was objectively excessive. 135 S.Ct. at 2470. In resolving this question, the Court began by clarifying that excessive force claims involve "two separate state-of-mind questions." Id. at 2472. The first concerns the official's "state of mind with respect to his physical acts." Id. Drawing on its decision in Lewis , the Court explained that accidental or negligent acts are not subject to Fourteenth Amendment liability while those committed purposefully, knowingly, or (perhaps) recklessly are. Id.
The second mental state, and the one at issue in Kingsley , "concerns the defendant's state of mind with respect to whether his use of force was 'excessive.' " Id. On this score, the Supreme Court held that, unlike in the Eighth Amendment context, the standard for a pretrial detainee suing under the Fourteenth Amendment is "objective" and merely requires showing that "the force purposely or knowingly used against him was objectively unreasonable." Id. at 2472-73. This objective showing can be established through contextual factors and the Court identified six non-exhaustive "considerations." Id. at 2473. These factors included proportionality or, as the Court described it, "the relationship between the need for the use of force and the amount of force used." Id. They also included related indicia such as "the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Id.
Viewed against the backdrop of this circuit's Fourteenth Amendment jurisprudence, Kingsley offers two important insights. First, the objective standard it announced confirms that the subjective mental state referenced in Glick and some of this Court's other precedents is not a necessary showing. Second, and more significantly, Kingsley used modified terminology to describe the Fourteenth Amendment standard. Although prior excessive force cases spoke of whether the official's conduct "shocks the conscience," Lewis , 523 U.S. at 846-47, 118 S.Ct. 1708 (collecting cases), Kingsley asked whether the force was "objectively unreasonable," 135 S.Ct. at 2473. More on this later.
*535 Returning to the case at hand, defendants protest that, contrary to plaintiffs' assertion, Kingsley is not the appropriate touchstone for assessing the alleged Fourteenth Amendment violation. On defendants' reading, Kingsley 's holding is doubly inapposite because it is limited to pretrial detainees and did not abdicate the traditional "shocks the conscience" standard. Both arguments are unpersuasive.
Defendants' first-and principal-argument is based on a misinterpretation of this Court's earlier statement that Kingsley "addressed only the legally requisite state of mind required for a pretrial detainee's excessive force claims." Dancy v. McGinley , 843 F.3d 93, 117 (2d Cir. 2016). Defendants understand this language as limiting Kingsley to pretrial detainees only. But this ignores the context. Dancy involved a Fourth Amendment excessive force claim and this Court was distinguishing between principles that applied under the Fourteenth Amendment and those that governed under the Fourth. See id. It follows that Dancy had no reason to address Kingsley' s applicability to non-detainees bringing claims under the Fourteenth Amendment.
Moreover, we have not treated the precise factual context at issue in Kingsley -a pretrial detainee claiming excessive force-as a limitation on the Fourteenth Amendment standard announced therein. In our one case to engage closely with Kingsley , we held that its standard applied not just to excessive force claims, but also to those alleging deliberate indifference toward pretrial detainees. Darnell v. Pineiro, 849 F.3d 17, 33-34 (2d Cir. 2017). In reaching this conclusion, the Darnell Court did not apply Kingsley 's language mechanically. Instead it looked to the sweep and substance of the Supreme Court's reasoning. We do the same.
To begin where Kingsley did, "a pretrial detainee can prevail" by alleging "that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." 135 S.Ct. at 2473-74. As discussed above, this standard is the essence of all Fourteenth Amendment claims, not merely those brought by pretrial detainees. In Lewis , a case that involved a non-detainee, the Supreme Court grounded its analysis in the same principle: "the touchstone of due process" is protection from "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." 523 U.S. at 845-46, 118 S.Ct. 1708 (brackets omitted). What's more, Kingsley 's reliance on Lewis as the source of the Fourteenth Amendment standard belies defendants' suggestion that claims by non-detainees are subject to a distinct test. See Kingsley , 135 S.Ct. at 2472-73.[1]
The distinction Kingsley drew was not between pretrial detainees and non-detainees. Instead, it was between claims brought under the Eighth Amendment's Cruel and Unusual Punishment Clause and those brought under the Fourteenth Amendment's Due Process Clause. 135 S.Ct. at 2475. As the Court observed, not only do the two clauses use distinct language, but, "most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all ." Id. (emphasis added). The same is true of non-detainees, except more so. After all, with a non-detainee the government has not even shown probable *536 cause of criminal activity, much less a public safety (or flight) risk warranting detention. For this reason, it would be extraordinary to conclude that "pretrial detainees ... cannot be punished at all, much less 'maliciously and sadistically,' " id. , while requiring non-detainees to prove malice and sadism.
Defendants offer no principled justifications to buttress such an implausible standard, nor could they. Their argument is contrary to this Court's entire body of non-detainee cases, which have long applied the standard announced in Glick , a pretrial detainee case. See, e.g. , Newburgh , 239 F.3d at 251-52 ; Tierney , 133 F.3d at 199. And yet, although defendants acknowledge that Kingsley represents a new gloss on the pretrial detainee standard, they would hold the non-detained plaintiffs to this Court's prior articulation of the pretrial detainee standard. To state the argument is to reveal its untenability.[2]
Shifting gears, defendants contend that Kingsley did not formally overrule the "shocks the conscience" standard. That may be true, but we think it is beside the point. This is because defendants' focus on phrasing reflects an overly formalistic view of Fourteenth Amendment law. To repeat, the central inquiry has always been whether the government action was rationally related to a legitimate government objective. Lewis , 523 U.S. at 846, 118 S.Ct. 1708. Although the Supreme Court has "spoken of the cognizable level of executive abuse of power as that which shocks the conscience," this merely showed that the "due process guarantee does not ... impos[e] liability whenever someone cloaked with state authority causes harm." Id. at 846, 848, 118 S.Ct. 1708. Instead, "the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." Id. at 847, 118 S.Ct. 1708 (internal quotation marks omitted).
As the Supreme Court has observed, "the measure of what is conscience shocking is no calibrated yard stick"; it merely "point[s] the way." Id. (internal quotation marks omitted). Mindful of this indefiniteness, Kingsley is best read as elaborating on this standard, not abandoning it. Kingsley held that excessiveness is measured objectively and then identified various considerations that inform the ultimate Fourteenth Amendment inquiry: whether the governmental action was rationally related to a legitimate governmental objective. 135 S.Ct. at 2473 (considering such things as the "relationship between the need for the use of force and the amount of force used").[3] To put a finer point on it, Kingsley teaches that purposeful, knowing or (perhaps) reckless action that uses an objectively unreasonable degree of force is conscience shocking.[4]
*537 Although we now hold that Kingsley provides the appropriate standard for all excessive force claims brought under the Fourteenth Amendment, it bears emphasizing that this new formulation is but a modest refinement of Glick 's four-factor test, on which this Court has long relied. The first three factors identified in Glick -the need for force, the relationship between the need and the degree of force used, and the extent of the injury, 481 F.2d at 1033 -parallel the six non-exhaustive factors identified in Kingsley . Consider Glick 's first factor, the need to use force. Kingsley effectively disaggregates this into three considerations that all bear on whether force was necessary. 135 S.Ct. at 2473 (encouraging courts to consider "the severity of the security problem," the threat perceived, and "whether the plaintiff was actively resisting"). As for Glick 's next two factors-"the relationship between the need and the amount of force that was used" and "the extent of injury inflicted," 481 F.2d at 1033 -these are explicitly incorporated into Kingsley . See 135 S.Ct. at 2473 (highlighting "the relationship between the need for the use of force and the amount of force used" and "the extent of the plaintiff's injury").
Turning to the fourth Glick factor, whether the force was applied "maliciously and sadistically for the very purpose of causing harm," 481 F.2d at 1033, Kingsley explained that this is not a "necessary condition for liability," 135 S.Ct. at 2476 (emphasis omitted). Instead it is simply one consideration "that might help show that the use of force was excessive." Id. (emphasis added). This interpretation is consistent with our own precedents, which have repeatedly assessed excessive force claims without looking to subjective intent. See, e.g. , Robison , 821 F.2d at 924 (holding that the assertion that officers "yanked [a woman] out [of her car], threw her up against the fender, and twisted her arm behind her back" was enough to prevent summary dismissal of an excessive force claim (internal quotation marks omitted)); Bellows , 555 F.2d at 1106 & n.1 (concluding that plaintiff stated an excessive force claim based solely on the injuries and absence of a legitimate government interest).
Applying Kingsley 's analysis to the allegations at hand, we conclude that the plaintiffs' complaint states a Fourteenth Amendment violation. First, consider the need for force. Under plaintiffs' account, which we must accept as true, the security threat posed by the protest was low. The video footage confirms that the demonstrators were non-violent and there was a robust police presence monitoring the crowd. Although someone may have thrown a glass bottle, this appears to have been an isolated and victimless incident. None of the onlookers filming and photographing the arrests interfered and additional officers were on scene to keep protesters at bay. The most significant problem confronting law enforcement appears to have been traffic disruption caused by protesters walking in the street. However, while mixing cars and pedestrians might have presented a hazard, this is the sort of public safety risk common to large public demonstrations, not necessarily an imminent threat warranting a significant use of force. In short, on the facts alleged, the "severity of the security problem" was minimal and the "threat reasonably perceived by the officers" was negligible. Kingsley , 135 S.Ct. at 2473.
In addition, there is no indication that plaintiffs were "actively resisting." Id. Quite the opposite: the complaint alleges that once the police began ordering people *538 to move to the sidewalks the plaintiffs promptly complied. (One plaintiff admits that he briefly stepped off the curb while yelling a critical comment at the police. But this was, as most, de minimis resistance.)
Turning to proportionality, the disparity between the threat posed by the protest and the degree of force is stark. The Department's 2010 report describes the purpose of an earlier LRAD model's area denial function as "send[ing] out sound at a dangerously high level [to cause] attackers to turn away, or at least, to cause pain/hearing damage to try to repel [an] attack." App. at 85 (emphases added). The control panel on the Model 100X that was used here warned operators in capital letters that entering within 10 meters of the device during operation was dangerous. See FAC ¶ 25. The device's product sheet likewise listed the LRAD's maximum volume as 136 decibels at one meter, well above the 120 decibels threshold where pain begins and just short of the 140 decibels at which the report advised that "[s]hort term exposure can cause permanent damage." App. at 86. Exposure to this dangerous volume (which we must assume from the pleadings) is a severe consequence for blocking traffic.
The injuries alleged by the plaintiffs (another Kingsley consideration, see 135 S.Ct. at 2473 ) are consistent with the report's projections. They endured auditory pain, migraines, tinnitus, and hearing loss, of varying degrees and duration. Several plaintiffs claimed that they still had periodic tinnitus as of the complaint's filing (a year and a half after the protest) and at least one plaintiff said that he experienced constant ringing. Another suffered nerve damage and hearing loss that required medical treatment. These impairments fit comfortably on the spectrum of injuries that this Court has found sufficient to state a Fourteenth Amendment violation. See, e.g. , Newburgh , 239 F.3d at 252 (holding that "head trauma, lacerations, and bruising" constitute a "substantial physical injury"); Robison , 821 F.2d at 924 (denying qualified immunity for a Fourteenth Amendment violation when officers caused bruises that lasted "a couple weeks").
Kingsley also asks whether the officers tried to "temper or to limit the amount of force." 135 S.Ct. at 2473. Nothing in the complaint suggests that they did. There was no audible dispersal warning before the defendants activated the area denial function, nor any other visible attempt to move protesters out of the street. Looking at the force itself, the plaintiffs allege that the officers used the LRAD at close range while "pointing it" at the demonstrators. FAC ¶ 229. In addition, the alleged injuries support an inference that the LRAD was set to an extremely high decibel-level.
Pulling these threads together, plaintiffs' allegations indicate that the officers' use of the LRAD's area denial function was disproportionate to the limited security risk posed by the non-violent protest and caused substantial physical injuries. Or, stated somewhat differently, the defendants' use of a device capable of causing pain and hearing loss was an "exercise of power without any reasonable justification in the service of a legitimate government objective." Lewis , 523 U.S. at 846, 118 S.Ct. 1708. Because defendants have chosen to appeal the denial of a motion to dismiss, we are compelled to accept the allegations as true and must therefore conclude that the complaint adequately states a Fourteenth Amendment claim.
B. Clearly Established Law
The remaining question is whether the constitutional right at issue was "clearly established at the time of the challenged conduct."
*539 al-Kidd , 563 U.S. at 735, 131 S.Ct. 2074 (internal quotation marks omitted). This inquiry "ensure[s] that the official being sued had fair warning that his or her actions were unlawful." Terebesi v.Torreso , 764 F.3d 217, 230 (2d Cir. 2014) (internal quotation marks omitted). And, because officers cannot have fair warning of rights that are not yet established, we look to precedent in existence at the time of the events. See Anderson , 483 U.S. at 639, 107 S.Ct. 3034. Here, this means that, for purposes of "clearly established law," we apply the Fourteenth Amendment analysis from Glick , not the Supreme Court's 2015 decision in Kingsley .
We begin with the delicate task of defining the right at issue. In doing so, we must be mindful that, on the one hand, "[c]haracterizing the right too narrowly to the facts of the case might permit government actors to escape personal liability." Newburgh , 239 F.3d at 251. On the other hand, defining clearly established law at too high a level of generality "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." Plumhoff v. Rickard , --- U.S. ----, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014).
Here, defendants' frame the question as "whether the officers violated the Fourteenth Amendment by using the LRAD 100X to aid in moving protesters to the sidewalks after the protest became obstructive and potentially violent." Appellants' Br. at 28. This framing puts not one but two thumbs on the scale in favor of defendants. First, it focuses on the officers' professed objective-moving protesters onto the sidewalk-while ignoring the degree of force that the officers allegedly used. Second, it recasts the protest as "violent," a characterization that, based on plaintiffs' allegations and the scene captured in the videos, is at best arguable. See, e.g. , id. at 34 (describing a "large crowd of hostile demonstrators-who greatly outnumbered and had surrounded the officers, were becoming violent, and were obstructing traffic"). Perhaps this is an inference that a factfinder might ultimately make, but at this stage we must draw all inferences in favor of the plaintiffs, not the defendants.
Defining the Fourteenth Amendment right according to the "particular circumstances" requires attention to the precipitating events, the government interest at issue, the degree of force used, and the reasonably anticipated consequences of the government action. To illustrate, consider the Supreme Court's analysis in Plumhoff . The Court began with the context, a "lengthy, high-speed pursuit" that "posed a danger both to the officers involved and to any civilians who happened to be nearby." 134 S.Ct. at 2023. The officers' objective was to "protect those whom [the suspect's] flight might endanger." Id. After the suspect crashed and then tried to speed away, several officers fired a collective 15 shots. Id. at 2024. It was undisputed that this was "deadly force." Id. at 2021, 2022, 2024. Weaving all these circumstances together, the Court addressed whether it was clearly established in 2004 that a suspect who leads a long and dangerous car chase has a right not to be subjected to deadly force used to protect public safety. Id. at 2023-24. The Court held that he did not. Id. Following this template, and accepting the facts alleged by the plaintiffs, the question here is whether, in 2014, non-violent protesters and onlookers, who officers had not ordered to disperse, had a right not to be subjected to pain and serious injury that was inflicted to move them onto the sidewalks.
Preliminarily, we address whether this conduct alleges a Fourteenth Amendment *540 violation under the legal standard applicable in 2014. Although our earlier discussion drew on Kingsley , the result is the same under Glick 's parallel factors. To repeat, this Court's longstanding test for excessive force claims teaches that force must be necessary and proportionate to the circumstances. See Glick , 481 F.2d at 1033 ; see also Newburgh , 239 F.3d at 253 ("[W]hether force is excessive depends as much upon the need for force as the amount of force used."). Here, on the allegations that we must accept as true, the problem posed by protesters in the street did not justify the use of force, much less force capable of causing serious injury, such as hearing loss.
The most significant difference between the Kingsley factors applied above and Glick is, of course, the latter's inquiry into "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Glick , 481 F.2d at 1033. But, as our prior cases show, this evidence has never been necessary for a Fourteenth Amendment excessive force claim. See, e.g. , Robison , 821 F.2d at 924 ; Bellows , 555 F.2d at 1106 & n.1. And, when parties choose to present evidence on this point, they can establish subjective intent through circumstantial evidence. See Blue v. Koren , 72 F.3d 1075, 1084 (2d Cir. 1995). Although the plaintiffs need not allege facts showing that defendants subjectively intended to use excessive force, we conclude that, given the gross disparity between the need for force and the level of pain and injury inflicted, the plaintiffs have sufficiently alleged that the officers behaved "maliciously and sadistically." See Newburgh , 239 F.3d at 252 (concluding that the fourth Glick factor was satisfied where the force used "far surpassed anything that could reasonably be characterized as serving legitimate government ends").
The remaining question is whether the right was clearly established. Would reasonable officers have known that subjecting non-violent protesters to pain and serious injury simply to move them onto the sidewalks violated the Fourteenth Amendment? Defendants insist that the circumstances before them were too dissimilar from then-existing precedents to provide this notice. They raise two principal arguments. Neither withstands scrutiny.
First, the defendants deny that it was clearly established in December 2014 that using force in a crowd control context violates due process. In their view, because this Court has not applied "substantive due process principles to crowd control," the officers lacked notice that the right against excessive force applies to non-violent protesters. Appellants' Br. at 37. But that is like saying police officers who run over people crossing the street illegally can claim immunity simply because we have never addressed a Fourteenth Amendment claim involving jaywalkers. This would convert the fair notice requirement into a presumption against the existence of basic constitutional rights. Qualified immunity doctrine is not so stingy. In fact, we rebuffed a nearly identical argument in Newburgh . There, a teacher who brutally assaulted a student insisted that he was entitled to qualified immunity because the right to be free from excessive force had not been "applied to the educational setting." 239 F.3d at 253. Unpersuaded, we declined to adopt such a piecemeal view of Fourteenth Amendment protections. Id. We see no reason to take a different tack here.
Were this not enough, a wealth of cases inform government officials that protesters enjoy robust constitutional protections. "[O]ur constitutional command of *541 free speech and assembly is basic and fundamental and encompasses peaceful social protest, so important to the preservation of the freedoms treasured in a democratic society." Cox v. Louisiana , 379 U.S. 559, 574, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) ; see also Jones v. Parmley , 465 F.3d 46, 56 (2d Cir. 2006) ("[T]he First Amendment protects political demonstrations and protests ...."); Belknap v. Leary , 427 F.2d 496, 499 (2d Cir. 1970) (Friendly, J. ) (recognizing a "First Amendment right[ ] to protest peaceably against the war-or anything else"). Against this backdrop, it would be passing strange to presume that protesters exercising a foundational constitutional right have weaker substantive due process rights than citizens in other contexts.
To be sure, government officials may stop or disperse a protest when faced with an "immediate threat to public safety, peace, or order," including "interference with traffic upon the public streets." Parmley , 465 F.3d at 57 (quoting Cantwell v. Connecticut , 310 U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) ). But this authority is not without limits. Among other things, officials have an obligation, "absent imminent harm," to inform demonstrators that they must disperse, id. at 60, and may not use unreasonable force, id. at 63. In short, our cases amply establish that protesters enjoy robust constitutional protection, protection of which reasonable law enforcement officers are well aware.
In spite of this precedent, defendants, drawing on distinguishable out-of-circuit authority, would have us believe that courts generally conclude that "use of force in a crowd control context [does] not violate substantive due process." Appellants' Br. at 37 n.12. Hardly. Our sister circuits and district courts in this Circuit have routinely applied excessive force principles to crowd control situations. See, e.g. , Nelson v. City of Davis , 685 F.3d 867, 882-83 (9th Cir. 2012) ; Buck v. City of Albuquerque , 549 F.3d 1269, 1289-90 (10th Cir. 2008) ; Asociacion de Periodistas de Puerto Rico v. Mueller , 529 F.3d 52, 59-62 (1st Cir. 2008) ; Darrah v. City of Oak Park , 255 F.3d 301, 306-08 (6th Cir. 2001) ; Duran v. Sirgedas , 240 Fed.Appx. 104, 112-13 (7th Cir. 2007) (summary order); Piper v. City of Elmira , 12 F.Supp.3d 577, 589-96 (W.D.N.Y. 2014). Training our focus on controlling authority, we see that this Court has repeatedly emphasized that officers engaging with protesters must comply with the same principles of proportionality attendant to any other use of force. See Parmley , 465 F.3d at 53, 63 ; Amnesty Am. v. Town of W. Hartford , 361 F.3d 113, 119, 123-24 (2d Cir. 2004). A brief summary of these cases is instructive.
In Parmley we refused to condone officers' assault on protesters who distributed flyers on a public highway. See 465 F.3d at 52. The record showed that several dozen protesters had gathered on private property for a lawful demonstration. Id. At some point, a contingent walked to a nearby highway to distribute fliers to passing cars. Id. After the protesters left the highway, a large group of officers stormed onto the private property without "order[ing] the protesters to disperse or provid[ing] them with any warning or justification for their actions." Id. at 53. They went on to assault non-violent, compliant protesters, "beating them with ... riot batons, dragging them by their hair and kicking them." Id. Failing to discern a legitimate justification for this violent response, we readily concluded that that the officers' motion for summary judgment based on qualified immunity was properly denied. Id. at 63.
We have also warned officers against gratuitously employing "pain compliance techniques," such as bending protesters' wrists, thumbs, and fingers backwards.
*542 Amnesty Am. , 361 F.3d at 119, 123-24. Reasoning that the pain associated with these techniques was "comparable [to] amounts of force" that we considered unreasonable when "used during the arrest of a nonviolent suspect," we concluded that a reasonable factfinder could decide that the force was excessive. Id. at 124. We elaborated that liability would turn on whether a jury found either that such techniques were a proportionate response to protesters purposefully making themselves difficult to arrest or that "the officers gratuitously inflicted pain in a manner that was not a reasonable response to the circumstances." Id. Gratuitous infliction of a pain compliance technique-the strategy behind the LRAD's area denial function-is exactly what the current plaintiffs allege.
Both Parmley and Amnesty America gave the defendants fair warning that the prohibition on excessive force applies to protesters. This is true even though both those cases arose under the Fourth Amendment. See Poe v. Leonard , 282 F.3d 123, 137 (2d Cir. 2002) ("Although the Fourth Amendment cases are not on all fours with [plaintiff's] claim under the Fourteenth Amendment, they are instructive ....").[5] After all, there is no intuitive reason to think a recalcitrant protester who is being arrested has more robust rights than a compliant protester who is not. Thus, we see no merit in defendants' argument that they lacked notice of the substantive due process rights of protesters.
Shifting attention from the protesters to the technology at issue, defendants' second argument is that, at the time of the events, the Fourteenth Amendment did not apply to LRADs. This argument has two parts: First, defendants contend that the officers cannot be liable because no decision from this Court or the Supreme Court "held or clearly foreshadowed that it would be unconstitutional to use an acoustic device under any circumstances," much less "under circumstances like those faced by the officers." Appellants' Br. at 19, 36-37 (emphasis omitted). Second, defendants insist that, because LRADs "function[ ] solely by sound," which is not an "instrument[ ] of force," a reasonable officer would not think that the Fourteenth Amendment applied. Id. at 23; see also id. at 35. We disagree on both fronts.
Defendants' first argument echoes a common refrain in qualified immunity cases-"pointing to the absence of prior case law concerning the precise weapon, method, or technology employed by the police." Terebesi , 764 F.3d at 237 n.20. But novel technology, without more, does not entitle an officer to qualified immunity. See Hope v. Pelzer , 536 U.S. 730, 731, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) ("[O]fficials can be on notice that their conduct violates established law even in novel factual situations."). In our first encounter with stun grenades, we concluded that, although neither this Court nor the Supreme Court had addressed that particular technology, "the Fourth Amendment principles governing police use of force apply with obvious *543 clarity[ ] to the unreasonable deployment of an explosive device in the home." Terebesi , 764 F.3d at 237 (internal quotation marks and citation omitted). Drawing on a decision from the Ninth Circuit, we declared, "[a]n officer is not entitled to qualified immunity" for lack of notice "every time a novel method is used to inflict injury." Id. (quoting Mendoza v. Block , 27 F.3d 1357, 1362 (9th Cir. 1994) ). Instead, we instructed that "[s]ome measure of abstraction and common sense is required with respect to police methods and weapons." Id. at 237 n.20. To drive the point home, we listed a series of innovative non-lethal weapons to which officers should apply common sense, including "sound guns" or "acoustical weaponry." Id. Given our call for common sense in the face of new technology, defendants cannot credibly complain they lacked notice that the proscription on excessive force applied to acoustic devices.
As to whether LRADs are instruments of force, defendants go astray by focusing on the mode of delivery rather than the physical effect. Under this Court's precedent, a device that has "incapacitating and painful effects" when used on a person is considered an instrument of force. Tracy v. Freshwater , 623 F.3d 90, 98 (2d Cir. 2010). Applying this standard, we have held that pepper spray, which employs chemical reactions rather than kinetic energy, "constitutes a significant degree of force." Id.[6] Drawing on well-established principles, we added that because "gratuitous force is unreasonable and therefore excessive[,] ... we presume that no reasonable officer could have believed that he was entitled to use pepper spray gratuitously against a restrained and unresisting arrestee." Id. at 99 n.5. In support, we relied on a First Circuit case concluding that unprovoked use of pepper spray against members of a nonthreatening crowd was excessive, an indication that this sort of gratuitous force against crowds is verboten. Id. (citing Asociacion de Periodistas, 529 F.3d at 60-62 ).
In Terebesi , to add just one more example, we followed the same approach. There, the officers urged that they were immune because no precedent established that the right against excessive force applied to stun grenades. 764 F.3d at 236. But we rejected that argument. Emphasizing the dangerous effects of these devices, which "cause[ ] fires, burns, and other injuries," we held that "a reasonable officer would [not] think it was constitutional to use these devices in routine searches." Id. at 236, 238.
We reach the same conclusion here. Even though sound waves are a novel method for deploying force, the effect of an LRAD's area denial function is familiar: pain and incapacitation. See Tracy , 623 F.3d at 98. In fact, this is what the LRAD was designed for. As explained in the NYPD's own report, the purpose of the area denial function is to "cause pain/hearing damage" that repels those in its path. App. at 85. Using common sense, any reasonable officer with knowledge of the LRAD's operations would understand that the area denial function represents a "significant degree of force." See Tracy , 623 F.3d at 98.
*544 To recap, assuming the truthfulness of the allegations in the complaint, and drawing all reasonable inferences in plaintiffs' favor, the defendants knew or should have known that the area denial function could cause serious injury. When engaging with non-violent protesters who had not been ordered to disperse, no reasonable officer would have believed that the use of such dangerous force was a permissible means of moving protesters to the sidewalks. Whatever legitimate interest the officers had in clearing the street, the use of sound capable of causing pain and hearing loss in the manner alleged in the complaint was not rationally related to this end. We therefore conclude that the district court properly denied the defendants' motion to dismiss based on qualified immunity.
* * *
Our decision regarding the defendants' use of the LRAD is a narrow one. We do not hold that the Fourteenth Amendment bars law enforcement from using LRADs. To the contrary, we are confident that, in appropriate circumstances, following careful study and proper training, LRADs can be a valuable tool for law enforcement. Their usefulness as a long-range communications device is plain. We also think that, under certain conditions, an LRAD that is properly calibrated might be a lawful means of ordering (or perhaps even compelling) protesters to disperse. We merely hold (1) that, on the allegations before us, which we must accept as true, the plaintiffs have stated a Fourteenth Amendment excessive force claim and (2) that purposefully using the LRAD in a manner capable of causing serious injury to move non-violent protesters to the sidewalks violated law that was clearly established as of 2014.
We are also mindful that the complaint before us is just one side of the story, told from the perspective of the plaintiffs. But courts and juries must assess excessive force claims from "the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Kingsley , 135 S.Ct. at 2473. It follows that, once the allegations are tested by evidence, particularly evidence about what the officers saw and knew, the defendants may yet be entitled to qualified immunity.
We can envision various factual showings that would change the calculus. One key variable is the state of unrest at the protest. The evidence may show that the defendants observed a more violent scene than is portrayed in the complaint and incorporated videos. Another key consideration is how the LRAD was used, most notably the volume of the device and its proximity to protesters and passersby. And, third, as Kingsley acknowledges, much hinges on what the defendants knew. Perhaps the defendants had not seen the report on the Model 3300 and lacked knowledge of the LRAD's harmful effects. The complaint alleges that the NYPD "has not properly trained its officers" on LRAD use and acknowledges that Department's use of force protocols "do not account for LRAD use." FAC ¶¶ 98, 412. So perhaps the defendants had received training but reasonably believed that they were not using the device in an unsafe or gratuitous manner. Any one of these non-exhaustive factors could warrant a reappraisal of qualified immunity.
Finally, we emphasize that when viewing the evidence from the perspective of a reasonable officer a factfinder must afford "ample room for mistaken judgments." Malley v. Briggs , 475 U.S. 335, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). This is particularly true where officers "have obligations that tend to tug against each other." Lewis , 523 U.S. at 853, 118 S.Ct. 1708.
Their duty is to restore and maintain lawful order, while not exacerbating disorder *545 more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made in haste, under pressure, and frequently without the luxury of a second chance.
Id. (internal quotation marks omitted). It follows that a jury or a court viewing events from the defendants' perspective must consider not just what the officers saw and knew, but also the rapidly evolving, uncertain, and tense circumstances in which they acted. We trust that discovery will provide fuller insight into this perspective.
CONCLUSION
For the foregoing reasons, we AFFIRM the district court's order insofar as it denied defendants qualified immunity for the Fourteenth Amendment claim. This case is REMANDED for further proceedings.

Additionally, when the Kingsley defendants argued that Lewis supported a subjective intent standard, the Court had an opportunity to distinguish its earlier decision as a case limited to non-detainees. But the Court did no such thing. Instead, it explained why that argument misread Lewis 's holding. 135 S.Ct. at 2475.

Defendants, moreover, point to no case in our Circuit dealing with non-detainees-before or after Kingsley -that treated proof of subjective intent as a necessary precondition for a successful Fourteenth Amendment excessive force claim. Thus, even if they could convince us that Kingsley should be cabined to pretrial detainees (which they cannot), this would not require us to dismiss an excessive force claim absent an allegation of malice or sadism. Kingsley made explicit what we have long taken for granted: a government actor's use of force violates due process when it is objectively excessive.

Framed in these terms, defendants cannot seriously dispute Kingsley 's logic. After all, their own brief acknowledges that, "[i]t is where officials take injurious action with no apparent government interest that this Court has found their conduct conscience-shocking." Appellant's Br. at 39 (emphasis added).

One might argue that this conclusion is in tension with Dancy 's observation that "Fourth Amendment claims are tied to reasonableness, which is considerably less demanding" than the Due Process Clause. 843 F.3d at 117. But, once again, because Dancy focused on the intent standard under the Fourth Amendment, it did not purport to address how Kingsley affected cases brought under the Due Process Clause.

Defendants' reply brief argues that Fourth Amendment cases "cannot establish the law for Fourteenth Amendment purposes." Appellants' Reply Br. at 22. This argument is inconsistent with the practice of the Supreme Court and this Circuit, both of which cross-pollinate between Fourth, Eighth, and Fourteenth Amendment contexts. See, e.g. , Graham , 490 U.S. at 396, 109 S.Ct. 1865 (relying on language from Glick , a Fourteenth Amendment case, to explain Fourth Amendment constraints); Hudson v. McMillian , 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (drawing on Glick in the Eighth Amendment context); Medeiros v. O'Connell , 150 F.3d 164, 170 (2d Cir. 1998) (analyzing Eighth Amendment case law to define a Fourteenth Amendment right).

Defendants claim that an LRAD differs from pepper spray because "it includes a highly effective loudspeaker mode that can help avoid the need for measures historically regarded as force." Appellants' Br. at 23. This is effectively an argument that LRAD's are dual-use devices capable of both exerting dangerous force and serving valuable, non-forceful functions. But the same is true of a riot stick, which can both bludgeon and direct traffic. Rather than absolving the riot stick from scrutiny, this dual functionality is all the more reason to focus on the particular action and ensuing effect, not the device itself.