Eaton v. Estabrook

# In the
# United States Court of Appeals
## For the Second Circuit

---

August Term, 2023
No. 23-151

JERE EATON,
*Plaintiff-Appellant,*

*v.*

STEVEN ESTABROOK, CITY OF STAMFORD,
*Defendants-Appellees.*

---

On Appeal from a Judgment of the United States District Court for
the District of Connecticut.

---

ARGUED: JANUARY 9, 2024
DECIDED: JULY 9, 2025
Before: LYNCH, NARDINI, AND KAHN, *Circuit Judges.*

---

Plaintiff-Appellant Jere Eaton sued Defendants-Appellees the City of Stamford and Steven Estabrook, a Stamford police officer, claiming that Estabrook's actions of lifting her into the air by her bra strap, driving her backward several feet in the air, and dropping her on the ground at an August 8, 2020, protest without a prior warning

while responding to a call for assistance violated her Fourteenth Amendment right to be free from excessive force, via 42 U.S.C. § 1983, as well as various provisions of Connecticut state law, including assault and battery. Defendants-Appellees moved for summary judgment on qualified immunity grounds. The United States District Court for the District of Connecticut (Sarala V. Nagala, *District Judge*) granted the motion, observing that while there were genuine disputes of material fact bearing on whether Estabrook deployed excessive force against Eaton, Estabrook was nevertheless entitled to qualified immunity because it was not clearly established at the time that his actions were unconstitutional. The district court also granted Estabrook summary judgment as to Eaton's state law claims, reasoning that Estabrook is entitled to state governmental immunity under Connecticut law.

We agree with the district court that there are genuine disputes of material fact informing whether Estabrook used excessive force, and that Estabrook is entitled to state governmental immunity as to Eaton's state law claims. But we conclude that Estabrook is not entitled to qualified immunity as to Eaton's Fourteenth Amendment claim at this point in the litigation, because the same factual disputes that bear on the issue of excessive force also bear on whether Estabrook's actions had been clearly established as unconstitutional at the time he took them. We therefore AFFIRM the district court's judgment in part, VACATE in part, and REMAND for proceedings consistent with this opinion.

---

ATHUL K. ACHARYA, Public Accountability, Portland, OR, *for Plaintiff-Appellant*.

2

BARBARA L. COUGHLAN, Assistant
Corporation Counsel, City of Stamford,
Stamford, CT, *for Defendants-Appellees.*

WILLIAM J. NARDINI, *Circuit Judge*:

In this appeal, we are once again confronted with difficult questions of sorting out, on summary judgment, whether a police officer's discretionary actions taken in the line of duty deprived a civilian of her constitutional rights and, if so, whether the legality of those actions was sufficiently unclear that the officer is entitled to qualified immunity. Cases like these depend mightily on the facts. Here, we conclude that there is enough uncertainty about key facts—especially what the officer saw when he arrived at the scene of a protest, in light of fragmentary body camera footage recorded by some police officers—that the case is not ripe for resolution by summary judgment.

On August 8, 2020, Defendant-Appellee Steven Estabrook, a police officer for the Stamford Police Department ("SPD"), was managing traffic at a protest when he received a "Code 30" call over his radio, which the parties agree meant "officers need assistance." Estabrook immediately responded to the call, traveling to its origin from the other end of the protest, where he had been stationed all day.

The body camera footage of Estabrook and two other officers shows more or less clearly what Estabrook *did* when he got to the scene. As his car rolled up, he jumped out and sprinted toward a

group of protesters, including Plaintiff-Appellant Jere Eaton. In a matter of seconds and without warning, Estabrook barreled into the group, pushed aside the man standing between himself and Eaton, yanked Eaton up by her bra strap, pushed her backwards several feet in the air, and threw her on the pavement. Eaton sustained injuries to her head and neck from her collision.

What is less clear from the footage is the full picture of what Estabrook *saw* upon arrival at the scene. The body camera footage shows Eaton standing peacefully, talking to a few people at the edge of the protest. But the recording does not show whether Estabrook could see what was going on beyond Eaton, where a few police officers were involved in a scuffle with some protestors. And even if Estabrook did see that tussle, the video leaves open the question of whether his trajectory into Eaton—essentially a tangent on the edge of the circle of protestors—could have plausibly been an effort to make way to an officer in need, or instead was so ill-directed toward such an objective as to suggest that he was gratuitously plowing into the first people he encountered.

Eaton sued Estabrook under 42 U.S.C. § 1983, claiming that the force he deployed against her was excessive in violation of the Fourteenth Amendment. She also brought other various state law claims based on Estabrook's conduct, including for assault and battery. Estabrook moved for summary judgment on qualified immunity grounds, which the United States District Court for the District of Connecticut (Sarala V. Nagala, *District Judge*) granted. It observed that there were genuine disputes of material fact, and, when

4

resolving those disputed facts in Eaton's favor, Estabrook's force was unconstitutionally excessive in violation of the Fourteenth Amendment. It nevertheless granted Estabrook qualified immunity because it concluded that it had not been clearly established as of August 8, 2020, that "a nonviolent but noncompliant protester[] had a right not to be pushed to the ground by a police officer responding to an emergency situation without a preceding warning from the officer to move out of the way." *Eaton v. Estabrook*, No. 3:21-CV-324 (SVN), 2023 WL 423122, at *8–*9 (D. Conn. Jan. 26, 2023). The court also concluded that Estabrook was entitled to state governmental immunity under Connecticut law because the only relevant exception to immunity for municipal employees—an officer who acted with malice—did not apply.

Upon review of this challenging factual record, we agree with the district court on some scores, and disagree on others. We agree that there are genuine issues of material fact bearing on whether Estabrook used unconstitutionally excessive force. We agree that, viewing all of those facts in Eaton's favor, Estabrook's conduct would have violated the Fourteenth Amendment. And we agree that Estabrook was entitled to state governmental immunity as to Eaton's state law claims premised on this conduct. But we disagree that Estabrook's conduct—when assuming that a jury would resolve all material disputes of fact in Eaton's favor—had not been clearly established as unconstitutional as of August 8, 2020.

5

Accordingly, we AFFIRM the district court's judgment in part, VACATE in part, and REMAND for further proceedings consistent with this opinion.

## I.    Background

The following facts are taken from the summary judgment record, which are undisputed unless otherwise noted. Because this appeal arises from a grant of summary judgment, we view the evidence in the light most favorable to Eaton as the non-moving party and draw all reasonable inferences in her favor. *Reese v. Triborough Bridge & Tunnel Auth.*, 91 F.4th 582, 589 (2d Cir. 2024).

This lawsuit stems from events that occurred at a protest held in Stamford, Connecticut on August 8, 2020. Estabrook was assigned to manage vehicular traffic at the protest. Eaton was also at the protest, though in a different part than where Estabrook was stationed.[1] The protest was sometimes unruly but largely nonviolent,

---

[1] Ironically, the record could support a finding that Eaton was not a participant in the protest. Eaton testified at her deposition that she was present at the police station that day not to protest but to participate in an unrelated laptop giveaway, and that she was present for the protest only because the police had asked her to stay at the station, in anticipation of the protestors arriving there, to serve as an intermediary between the police and the protestors. Then, once the protestors were moving away from the police station, Eaton testified that Captain Hohn asked her to continue helping the police by following the protestors, which she did. Captain Hohn, for his part, denied much of Eaton's account in his own deposition. Whatever the truth on this point, however, these facts are not relevant to the issue before us, as there is no evidence suggesting that Estabrook had any way of knowing them.

although the record is mixed as to what extent certain protestors engaged in defiance and physical violence.

The incident at issue began when Estabrook received a "Code 30" call on his radio from Captain Diedrich Hohn, who was in front of a Target store. Captain Hohn testified that he called Code 30 because "he was concerned about officer safety," J.A. 366 ¶ 35: "protestors started getting out of hand, [I] went to go effect an arrest, . . . we got attacked by other protestors, and the protestors outnumbered the police officers that were at the scene. So we needed help," *id.* 123. Another officer, Lieutenant Nolo, called a Code 30 at the same time.

The record is, unfortunately, not well developed on the meaning of "Code 30." Captain Hohn testified in his deposition that officers "have codes 1 through 100," *id.*, but averred in a later declaration that officers "have three response code[s]:" Code 1, Code 2, and Code 3, *id.* 37 ¶ 25. He further stated in that declaration that "Code 1 requires a routine response; Code 2 requires an urgent response; and Code 3 requires an emergency response. . . . A Code 3 is only rarely called and is a very serious call." *Id.* In his deposition, Estabrook described Code 30 as "[their] most severe call" that "only gets called once a year" and means "an officer needs immediate help." *Id.* 170. And the body camera footage of Estabrook and another officer shows that they responded very urgently upon receiving the Code 30. But the parties do not address that Captain Hohn called a Code 30 rather than a Code 3, or otherwise explain how Code 30 relates to Code 3; instead, they seem to conflate Code 30 and Code 3

without explanation. Notwithstanding these evidentiary gaps, the parties agree that at a basic level, Code 30 means "officers need assistance." *Id.* 366 ¶ 34.

Although Estabrook had not been at the Target—nor observed or interacted with Eaton—at any point prior to the Code 30, we briefly summarize the evidence of what transpired in front of the Target immediately preceding Estabrook's arrival, only to the extent that it may be probative of his observations upon arriving at the scene.

The majority of the protestors had gone home, with only forty to fifty remaining. Officers had asked the remaining protestors to disperse, get on the sidewalk, and "get back" multiple times. *Id.* 365 ¶¶ 29–30, 32. Eaton admits that she did not heed the requests to "get back." *Id.* 366 ¶ 33. Although the parties generally agree that at least some of the remaining protestors were defying officer orders and being unruly, they dispute the precise level of disobedience and disruption. Defendants-Appellees claim that the remaining protestors were "getting out of hand," "advancing" on officers, and being "uncontrollable and aggressive." *Id.* 36–37 ¶¶ 19–20, 23. Eaton disputes that characterization, pointing to body cam footage that she contends shows a less aggressive, thinned-out crowd. But all agree that there was some degree of hostility between the police and some of the protestors, and that the crowd had become "loud and . . . chaotic." *Id.* 365 ¶ 31. The body camera footage of two officers from in front of the Target in the minute immediately preceding Estabrook's arrival shows a few officers and protestors clashing and scuffling, with at least one officer attempting to arrest a

8

protestor who appeared to be resisting. However, as stated above, Estabrook did not see any of this before arriving at the Target.

The evidence of Estabrook's actions upon receiving the Code 30 comes from his depositions, declaration, and body camera footage; Eaton's deposition; and the body camera footage of two other officers. Upon receiving the Code 30, Estabrook testified that he responded to the origin of the call with the objective "to get there and make sure the police officers were okay." *Id.* 177. When he arrived at the Target, he rushed out of the still-moving vehicle and immediately began running toward a relatively small, sparsely populated group of protestors (approximately ten) standing in the street to the left of a parked police cruiser. Estabrook stated in his declaration of May 31, 2022, that he "saw a large group of people yelling and screaming," and that the group "appeared to be surrounding Captain Hohn and other officers." *Id.* 44 ¶ 8. In his earlier deposition of February 7, 2022, however, he did not mention seeing a group of people surrounding Captain Hohn—he testified that upon arriving to the scene, he saw Lieutenant Nolo but not Captain Hohn. He also did not testify that a group of people was surrounding any officers.

It is hard to discern from the extremely brief and fragmented body camera footage what Estabrook saw when he arrived. From what can be seen, two police officers were standing behind a parked cruiser in the distance with about ten protestors in a loose circle around them—including a group of three protestors, one of whom was Eaton, standing on the outside of the circle closest to Estabrook. The other two protestors were standing with their backs facing

9

Estabrook as he approached the group. Eaton was standing to the right of the men facing Estabrook's direction but appears to have been partially blocked from Estabrook's view by one of the men. There appears to have been an unobstructed, but less direct, path forward toward the officers to the left of the group. As Estabrook approached the group, an unobstructed path toward the police officers immediately to the right of the group came into view.

Estabrook claims that he "reached the group and pressed through a crowd of approximately 5-8 people that surrounded the officers," and, "[i]n [his] attempt to gain access to officers, [his] path was blocked" by the two men standing with Eaton, so he "pushed through [them]." *Id.* 44 ¶¶ 10–11. This portion of his account is more or less consistent with what the body camera footage shows. Estabrook admits that he did not give the two men a warning before knocking them down. Estabrook's body camera shows that he then immediately grabbed Eaton by her bra strap, lifted her up, and pushed her backwards several feet in the air, ultimately dropping her onto the pavement. All in all, Estabrook's interaction with Eaton lasted perhaps three seconds.

Despite rewatching his body camera footage during his deposition, Estabrook steadfastly denied ever touching Eaton. He testified that he did not "knock [Eaton] down," he did not "put [his] hands on her," and that he never "touch[ed] [Eaton]." *Id.* 154–59. He instead claims that he "first observed Eaton when she was on the ground," *id.* 369 ¶ 54, and that it "appeared to [him] that the men fell to the ground along with a female," later identified as Eaton, "who

10

[he] had not seen upon his approach," *id.* 44 ¶ 12.  In his declaration, he did not address his collision with Eaton beyond stating that he "did not intend to collide with her that day when [he] pushed though the two men," and if he did collide with her, "it was inadvertent."  *Id.* 44 ¶ 14; *see also id.* 29 ¶ 50 (stating in his statement of undisputed facts that he and Eaton "may have collided").

After witnessing Estabrook's collision with Eaton, another officer yelled, "No, in a circle!  Estabrook!  Back up over here!", approached Estabrook, and grabbed his arm.  Protestors rushed to Eaton's aid, and Estabrook surveyed the area around him and observed Eaton lying on the ground.

Eaton furnished evidence that she sustained substantial injuries to her head and back and experienced pain and emotional distress resulting from her collision with Estabrook.

In March 2021, Eaton filed this lawsuit, bringing a Fourteenth Amendment claim against Estabrook for excessive force, via 42 U.S.C. § 1983, as well as state law claims for assault, battery, recklessness, and negligence based on his conduct.[2]  She also brought municipal liability claims against the City of Stamford.  Defendants-Appellees moved for summary judgment on all of Eaton's claims, which the district court granted in full.  The court concluded that although there were genuine disputes of material fact as to whether Estabrook used excessive force, he was nevertheless entitled to qualified immunity as to the federal claim because his conduct had not been clearly

---

[2] Eaton later abandoned the negligence claim before the district court.

11

established as violative of the Fourteenth Amendment as of August 8, 2020. The court also concluded that both Estabrook and the City were entitled to governmental immunity under Connecticut law as to the state law claims against them. Eaton now appeals the district court's grant of qualified immunity to Estabrook as to both her state and federal claims.[3]

## II.    Discussion

"Summary judgment is appropriate when, viewing the evidence favorably to the non-movant, there is no genuine issue of material fact and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." *Wiggins v. Griffin*, 86 F.4th 987, 992 (2d Cir. 2023). "A genuine issue of material fact exists if the record, and appropriate inferences drawn from it, would permit a reasonable jury to return a verdict for the nonmoving party." *Murphy v. Hughson*, 82 F.4th 177, 183–84 (2d Cir. 2023). "We review the district court's grant of summary judgment *de novo*," and "[w]e 'may affirm only if the record reveals no genuine issue of material fact for trial.'" *Bart v. Golub Corp.*, 96 F.4th 566, 569 (2d Cir. 2024) (quoting *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 258 (2d Cir. 2023)).

In the qualified immunity context, "[p]re-trial resolution of the defense [of qualified immunity] . . . may be thwarted by a factual dispute." *Warren v. Dwyer*, 906 F.2d 70, 74 (2d Cir. 1990). "Any disputed questions of material fact—such as the acts of the defendant

---

[3] Eaton does not appeal the dismissal of her claims against the City.

12

and their effects on the plaintiff—are to be determined by the factfinder." *Walker v. Schult*, 45 F.4th 598, 617 (2d Cir. 2022). In cases where material factual disputes preclude pretrial resolution based on qualified immunity, "[c]ourts . . . have permitted the defense to be raised at the close of plaintiff's evidence on a motion for a directed verdict, and even on a subsequent motion for judgment notwithstanding the verdict." *Warren*, 906 F.2d at 74. If at that point there are still genuine factual issues to be determined by the fact finder, necessitating submission of the case to the jury, "[o]nce the jury has resolved any disputed facts that are material to the qualified immunity issue[,] the court then may make the ultimate legal determination of whether qualified immunity attaches *on those facts*." *Walker*, 45 F.4th at 618 (alteration marks, internal quotation marks, and citation omitted). In these circumstances, juries often return special interrogatories, specifying their factual findings that bear on whether the defendant is entitled to qualified immunity. *See Warren*, 906 F.2d at 76.

## A. Federal Qualified Immunity

Eaton challenges the district court's grant of qualified immunity to Estabrook on her Fourteenth Amendment excessive force claim, brought pursuant to Section 1983.

Section 1983 provides a private cause of action for damages against government actors for "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Although Section 1983 "on its face admits of no immunities,"

13

*Malley v. Briggs*, 475 U.S. 335, 339 (1986), the Supreme Court has read common law immunity principles into the statute, determining that state executive officials are qualifiedly immune from suits for damages under Section 1983 when their challenged actions were taken in the course of their official duties while performing discretionary functions, *see Harlow v. Fitzgerald*, 457 U.S. 800, 807, 818 (1982); *Butz v. Economou*, 438 U.S. 478, 504 (1978); *accord Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019).

But as its name suggests, this immunity is not absolute. Immunity attaches only "insofar as [the officer's challenged] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Linton v. Zorn*, 135 F.4th 19, 30 (2d Cir. 2025) (quoting *Harlow*, 457 U.S. at 818). Accordingly, the doctrine "provide[s] ample protection to all but the plainly incompetent or those who knowingly violate the law." *Wiggins*, 86 F.4th at 994 (quoting *Malley*, 475 U.S. at 341).

We engage in a two-step inquiry to determine whether qualified immunity is appropriate. Qualified immunity applies unless (1) the official violated the plaintiff's statutory or constitutional right, and (2) that "right was 'clearly established' at the time of the challenged conduct." *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

Before proceeding to this two-step analysis, we take a brief moment to observe why qualified immunity exists. As the Supreme Court has constantly reaffirmed, the doctrine is essential to the

14

efficacious administration of the executive function at the local, state, and federal levels. *See, e.g., Harlow*, 457 U.S. at 814. In addition to mitigating "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office," qualified immunity also serves the important function of assuaging "the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties." *Id.* (internal quotation marks and citation omitted). In short, qualified immunity gives officers the peace of mind necessary to perform their discretionary duties—and make the split-second decisions inherent in them—without the chilling effect of unfair hindsight scrutiny.

For the reasons that follow, we simply cannot tell at this stage of the case whether qualified immunity is warranted.

### 1. Excessive Force

Eaton claims that Estabrook's conduct violated her Fourteenth Amendment right to be free from excessive force. We agree with the district court that there are genuine disputes of material fact that bear on whether Estabrook's use of force was unconstitutionally excessive.

"The right not to be subject to excessive force, perhaps most commonly associated with the Fourth and Eighth Amendments, can also arise under the Fourteenth." *Edrei v. Maguire*, 892 F.3d 525, 533 (2d Cir. 2018). "This is because '[t]he touchstone of due process,' which 'is protection of the individual against arbitrary action of

15

government,' bars 'the exercise of power without any reasonable justification in the service of a legitimate governmental objective.'" *Id.* (first quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974); and then quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

The test for determining if force is unconstitutionally excessive under the Fourteenth Amendment is whether "the force purposely or knowingly used against [the plaintiff] was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Thus, force is excessive if it is "not rationally related to a legitimate governmental objective or . . . excessive in relation to that purpose." *Edrei*, 892 F.3d at 535 (quotation marks omitted).

As to the first prong of the test, there are genuine disputes of material fact that inform whether Estabrook possessed the requisite mental state—knowledge—when he collided with Eaton. Estabrook maintains that any contact with Eaton was inadvertent, and that he did not see her at all until he saw her on the ground after colliding with her.[4] But the body cam footage shows that Estabrook grabbed Eaton's bra strap and thrust her in the air in a manner that could easily be considered deliberate and inconsistent with incidental contact. Thus, a reasonable jury could reject Estabrook's testimony and conclude, based on the video, that Estabrook knowingly applied force to Eaton.

---

[4] As discussed above, in his deposition, Eaton adamantly denies ever touching Eaton at all—intentionally or not—even after being shown body camera footage that clearly shows that he made physical contact with her.

16

As to the second prong of the test, there are genuine disputes of material fact that pertain to whether Estabrook's use of force was "objectively unreasonable." *Kingsley*, 576 U.S. at 397. "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.' A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* (citations omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The following considerations bear on this determination:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.*; *see Edrei*, 892 F.3d at 534. Here, there are three primary disputes that bear on this question: (1) the meaning of Code 30, (2) what Estabrook saw when he arrived on the scene, and (3) whether his conduct appears plausibly related to his stated goal of responding to officers in need.

With respect to the "severity of the security problem at issue," *Kingsley*, 576 U.S. at 397, Estabrook primarily points to the Code 30, arguing that it signaled that there was a dire emergency. However, the record is underdeveloped and equivocal on this point. While it is undisputed that Code 30 means that an officer "needs immediate assistance," J.A. 366 ¶ 37, the precise level of urgency it denotes is

17

disputed. Estabrook testified in his deposition that a Code 30 is the "most severe call" and "only gets called once a year," *id.* 170, and body camera footage shows Estabrook and another officer responding quite expeditiously after receiving the Code 30. But Captain Hohn gave inconsistent accounts of what codes SPD officers use—he testified in his deposition that they "have codes 1 through 100," *id.* 123, but then stated in his later declaration that there are only three response codes: Code 1, Code 2, and Code 3. And while the parties agree that "[a] Code 3 is only rarely called and is a very serious call," *id.* 366 ¶ 35, they also agree that Captain Hohn (and Lieutenant Nolo) called a Code 30, *not* a Code 3. Perhaps any code that starts with the digit "3" is considered a Code 3. Or maybe Codes 3 and 30 are entirely different. We cannot explain why the parties failed to elicit deposition testimony clarifying any of this. But at this stage, we are left with only a muddle on this point. Given the present state of the record, a reasonable jury could conclude that Code 30 does not carry the high level of exigency Estabrook urges, bearing in mind that it is *Estabrook*'s burden to establish the facts necessary to his qualified immunity defense, and gaps in the record inure to his detriment at this stage. *See Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018) ("Qualified immunity is an affirmative defense on which the defendant has the burden of proof.").

There are also genuine disputes of material fact about precisely what Estabrook observed when he arrived at the Target, which bear on "the threat reasonably perceived by the officer." *Kingsley*, 576 U.S. at 397. He initially testified that upon arrival, he saw Lieutenant Nolo

18

and not Captain Hohn. But he later stated that he "saw a large group of people yelling and screaming," and that the group "appeared to be surrounding Captain Hohn and other officers." J.A. 44 ¶ 8. Estabrook's body camera footage, on the other hand, shows a small, relatively spaced-out group of protestors, none of whom appear to be rowdy or otherwise posing immediate danger to officers. Moreover, as discussed above, it is not easily discernible from the brief and fragmented body camera footage to what extent Estabrook was able to see the officers scuffling with protestors in the distance, or whether those officers appeared to be in danger. The speed with which Estabrook got out of his car and ran toward Eaton and the two protestors raises a question as to whether Estabrook had sufficient time to observe and assess whether any officers he may have seen were in danger. Based on the present record, a factual dispute exists as to whether Estabrook saw officers surrounded by a group of protestors or otherwise in danger when he arrived at the scene.

Lastly, there are material factual disputes that bear on "the relationship between the need for the use of force and the amount of force used." *Kingsley*, 576 U.S. at 397. Estabrook contends that he needed to deploy the force he used "to gain access to officers." J.A. 44 ¶ 11. But he admits that he did not give a warning before colliding into the group, and the body camera footage shows that Eaton and the two men she was standing with were not being unruly, much less "actively resisting," *Kingsley*, 576 U.S. at 397,[5] which cuts against the

---

[5] It could of course be said that Eaton was "resisting" to some degree in the sense that she had not heeded officer orders to get out of the street. But any

19

need for force. As the record stands, a reasonable juror could look at the video recording and conclude that Eaton was simply standing there, doing nothing in particular. And the force Estabrook deployed—hoisting her off the ground by her bra strap and pushing her back into the air several feet before dropping her onto the pavement—was substantial. Moreover, Estabrook's body camera footage could be construed to show that the path he took was not the most direct route toward the other officers, and that he would have reached them faster if he had simply gone around Eaton rather than through her. Accordingly, the record establishes the existence of a genuine issue of material fact as to whether there were obvious, viable, less drastic alternative means available to Estabrook to reach the other officers (assuming he even saw them), and whether the force used was unreasonably excessive. *See Brown v. City of New York*, 798 F.3d 94, 103 (2d Cir. 2015) ("[T]he availability of a much less aggressive technique is at least relevant to making the ultimate determination of whether excessive force was used.").

Thus, when construing these factual disputes in Eaton's favor, a reasonable jury could conclude that the force Estabrook deployed was objectively unreasonable and violated her Fourteenth Amendment right to be free from excessive force.

---

resistance by Eaton prior to when Estabrook observed her is irrelevant because Estabrook has not presented any evidence that he was aware of any orders given to the protesters, much less Eaton's compliance or noncompliance with such orders.

20

## 2. Clearly Established Law

The next question is whether it had been clearly established on August 8, 2020, that Estabrook's force was unconstitutionally excessive. "A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what [they are] doing violates that right." *Linton*, 135 F.4th at 32 (alteration marks omitted) (quoting *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022)). "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Torcivia v. Suffolk County, New York*, 17 F.4th 342, 367 (2d Cir. 2021) (quoting *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004)). "This does not mean that 'an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" *Bangs v. Smith*, 84 F.4th 87, 96 (2d Cir. 2023) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "[W]hether the law was sufficiently clearly established is . . . an issue of law that we consider *de novo*." *Id.* (alteration marks omitted) (quoting *Outlaw*, 884 F.3d at 366).

The question of whether the defendant's force was excessive substantially overlaps with the question of whether the defendant's use of force was objectively reasonable under clearly established law. *See Stephenson v. Doe*, 332 F.3d 68, 77–80 (2d Cir. 2003). Having concluded that a reasonable jury could find that Estabrook's force was objectively unreasonable, Estabrook is entitled to qualified immunity

21

only if, at the time of his conduct, binding case law had not articulated with sufficient specificity that such conduct was unconstitutional, either because of the novelty of the type of force or its application in a novel context. We do not think that Estabrook's conduct—construing all factual disputes in Eaton's favor—was materially novel in either respect. Instead, we conclude that the conduct fits comfortably within that which was prohibited as unconstitutionally gratuitous force against non-resisting arrestees or protestors as of August 8, 2020.

In 2004, we decided *Amnesty America v. Town of West Hartford*, 361 F.3d 113 (2d Cir. 2004), which concerned a peaceful demonstration at an abortion clinic. *Id.* at 118. When police officers attempted to arrest the demonstrators, the demonstrators "employed 'passive resistance' techniques to impede their arrest, including going limp, refusing to identify themselves, and refusing to unlock the chains that they had used to bind themselves together." *Id.* The plaintiffs alleged that "the police responded with far more force than was necessary, and inflicted severe pain on the demonstrators by dragging them out of the building by their elbows, using choke holds, and lifting them off the floor by their wrists." *Id.* We concluded that these allegations were sufficient to raise factual disputes that precluded summary judgment on the issue of whether the police employed excessive force under the Fourth Amendment. *Id.* at 123–24.

Here, it is undisputed that Eaton did not resist any order by Estabrook to move—indeed, Estabrook admits he never administered

22

a warning. Nor is there evidence that Estabrook believed that Eaton had disregarded such a command by a different officer. His use of force against Eaton similarly would not have been necessary to achieve his goal of responding to an officer in trouble if (1) Eaton were not actually in his way, and there were other obvious, clear, direct paths available to reach that officer, or (2) Estabrook could have either asked Eaton to move, or moved her less forcefully.

Six years after *Amnesty*, we decided *Tracy v. Freshwater*, 623 F.3d 90 (2d Cir. 2010), which concerned the deployment of pepper spray on a non-resisting arrestee. There, during a traffic stop, officers scuffled with the plaintiff (Patrick Tracy), who was resisting arrest and attempted to flee. *See id.* at 93. During Tracy's flight, he tripped and fell, at which point an officer jumped on him. *Id.* at 94. The officer placed one of Tracy's hands in handcuffs while Tracy's other arm was pinned under his body. *Id.* The officer demanded that Tracy show his second hand so that the officer could also place it in handcuffs. *Id.* As Tracy tried to extract his second hand from under his body, he told the officer that he was not resisting. *Id.* After he got his hand free, the officer placed it in handcuffs. *Id.* The officer then sprayed Tracy's face with pepper spray from only a few inches away. *Id.*

We vacated the district court's grant of qualified immunity to the officer as to Tracy's excessive force claim premised on the officer's use of pepper spray, concluding that "a reasonable juror could find that the use of pepper spray deployed mere inches away from the face of a defendant already in handcuffs and offering no further active resistance constituted an unreasonable use of force." *Id.* at 98.

23

Although the Court did not reach the issue of whether qualified immunity would nevertheless have attached based on the clearly established prong of the test as the defendant did not raise that argument on appeal, it

> note[d] that it was well established at the time of the underlying altercation that the use of entirely gratuitous force is unreasonable and therefore excessive, and in light of this precedent, we presume that no reasonable officer could have believed that he was entitled to use pepper spray gratuitously against a restrained and unresisting arrestee.

*Id.* at 99 n.5 (citing *Breen v. Garrison,* 169 F.3d 152, 153 (2d Cir. 1999)).

Thus, as of at least 2010, it had been clearly established in this Circuit that "that the use of entirely gratuitous force is unreasonable and therefore excessive." *Id.* Although that principle is somewhat general, the *Tracy* panel had no issue applying that general principle to the specific facts of its case to conclude that no reasonable officer would, based on that clearly established principle, believe it was permissible to use pepper spray on a non-resisting, restrained arrestee. Moreover, the deployment of force against an arrestee who had just previously resisted, but was not actively resisting at the precise moment of deployment, was unconstitutionally gratuitous.

Here, Eaton was not actively resisting at all—indeed, she was not even under arrest. That fact alone entitles her to a greater interest in freedom from excessive force than an arrestee like Tracy who had just moments before run from a police officer and engaged in a

24

physical struggle with him. *See Edrei*, 892 F.3d at 542 ("[T]here is no intuitive reason to think a recalcitrant protester who is being arrested has more robust rights than a compliant protester who is not."). Moreover, just as it was unclear why the officer needed to use pepper spray while he had Tracy restrained, it is not clear why Estabrook needed to barrel into Eaton, if, as a reasonable jury could find on this record, she was not an obstacle to his stated objective. *See Rogoz v. City of Hartford*, 796 F.3d 236, 248 (2d Cir. 2015) (concluding that although the plaintiff had fled from police, creating a general exigency, once the plaintiff "had pulled over when he noticed the police vehicles, had complied with officers' orders to exit his car, and had complied with their orders to lie face down on the ground with his hands behind his back, and had done so without any show of resistance, a jury could find that, by that time, there was no urgency that necessitated jumping on [the plaintiff's] back").

Eight years later, in 2018, we held in *Muschette on Behalf of A.M. v. Gionfriddo* that *Tracy* had clearly established that "officers may not use a taser against a compliant or non-threatening suspect." 910 F.3d 65, 69 (2d Cir. 2018). And two years after that, in July 2020, we held in *Lennox v. Miller* that it was a clearly established violation of the Fourth Amendment's prohibition on excessive force for an officer to put his "full body weight on [a non-resisting arrestee], kneel[] on her back, and slam[] her head into the ground" when "she had already been handcuffed and positioned face down." 968 F.3d 150, 156–57 (2d Cir. 2020). The *Lennox* panel noted that it had been "clearly established by our Circuit caselaw that it is impermissible to use

significant force against a restrained arrestee who is not actively resisting." *Id.* at 157. It further observed that "this is true despite differences in the precise method by which that force was conveyed." *Id.*

We confirmed in *Edrei v. Maguire* that these principles apply with equal force to the Fourteenth Amendment protest context as in the Fourth Amendment arrest context. *See* 892 F.3d at 533. There, we concluded that officers' activation of an LRAD alarm, an "acoustic weapon[] developed for the U.S. military" that "can propel piercing sound at higher levels . . . than are considered safe to human ears," *id.* at 529–30 (quotation marks omitted), to cause nonviolent protestors to disperse was violative of clearly established law at the time under the Fourteenth Amendment's excessive force rubric. *Id.* at 544. We observed that that "the security threat posed by the protest was low" because the protestors were "non-violent"; that "[t]he most significant problem confronting law enforcement appears to have been traffic disruption caused by protesters walking in the street"; and that "there [wa]s no indication that the plaintiffs were actively resisting" and were generally compliant with officer commands. *Id.* at 537–38 (internal quotation marks omitted). We accordingly concluded that, "[p]ulling these threads together, plaintiffs' allegations indicate that the officers' use of the LRAD's area denial function was disproportionate to the limited security risk posed by the non-violent protest and caused substantial physical injuries." *Id.* at 538.

The *Edrei* panel rejected defendants' argument that "because this Court has not applied substantive due process principles to crowd control, the officers lacked notice that the right against excessive force applies to non-violent protesters," reasoning that "[q]ualified immunity doctrine is not so stingy." *Id.* at 540 (internal quotation marks omitted). It concluded that *Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006) (holding that officers violated the Fourth Amendment rights of demonstrators, some of whom were under arrest and some of whom were not, by "thr[owing] several plaintiffs to the ground . . . ; beat[ing] various plaintiffs with batons; kick[ing] and punch[ing] several of them; and push[ing] at least one man . . . to the ground and chok[ing] him"), and *Amnesty America* put defendants on fair notice "that the prohibition on excessive force applies to protesters . . . . even though both those cases arose under the Fourth Amendment." *Edrei*, 892 F.3d at 542. Accordingly, as of at least 2018, "our cases amply establish that protesters enjoy robust constitutional protection" and that "this Court has repeatedly emphasized that officers engaging with protesters must comply with the same principles of proportionality attendant to any other use of force." *Id.* at 541.

We conclude that these precedents provided Estabrook sufficient notice on August 8, 2020, that he would not have license to yank up a protestor by her bra strap, drive her backward several feet, and throw her down on the ground, while responding to a call for officer assistance where she was not actively resisting police commands; where it is unclear whether he had any basis to think he

27

needed to get past her to reach officers in danger; where he had not given her a warning nor asked her to step aside first; where there may have been other less drastic means available to accomplish moving past her, such as stepping around her or simply pushing past her in a less forceful manner; and where she sustained serious head and neck injuries. This conclusion is a natural application of our precedent because, "in the light of pre-existing law[,] the unlawfulness [of Estabrook's conduct]," construed in the light most favorable to Eaton, would have been "apparent." *Bangs*, 84 F.4th at 96 (quotation marks omitted).

\* \* \*

In sum, we hold that there are important remaining factual disputes bearing on whether Estabrook's force had been clearly established as unconstitutionally excessive as of August 8, 2020, that preclude summary judgment on qualified immunity grounds. We accordingly vacate the district court's grant of summary judgment to Estabrook on Eaton's Fourteenth Amendment excessive force claim and remand to the district court for further proceedings consistent with this opinion.

## B. State Governmental Immunity

Eaton also appeals the district court's conclusion that Estabrook is entitled to common law governmental immunity under Connecticut law as to Eaton's state law claims for state law assault, battery, and recklessness.

28

Connecticut law provides governmental immunity from suit to municipal employees facing liability arising from their "misperformance" of "discretionary act[s]." *Daley v. Kashmanian*, 344 Conn. 464, 479 (2022) (quotation marks omitted); *see* Conn. Gen. Stat. § 52-557n(a)(2)(B). Pursuant to that authority, "[p]olice officers are [generally] protected by discretionary act immunity when they perform the typical functions of a police officer." *Daley*, 344 Conn. at 481 (internal quotation marks omitted). One exception to this general rule is relevant here:[6] "where the alleged acts involve malice, wantonness or intent to injure, rather than negligence." *Fleming v. City of Bridgeport*, 284 Conn. 502, 532 (2007) (internal quotation marks omitted). "A showing that officers acted with malice such that they are not entitled to qualified immunity is a heavy burden," and requires finding that they acted with an "improper motive." *Id.* at 535–36. Unlike the federal rule that places the burden on the defendant public official to demonstrate qualified immunity, Connecticut law places the burden on the plaintiff to demonstrate that the case falls within one of the exceptions to the general rule of immunity for discretionary functions. *See id.* at 532.

The district court rejected Eaton's argument that there are genuine disputes of material fact as to whether Estabrook acted with malice when he deployed force against her. Eaton disagrees, citing evidence that Estabrook "heard taunts from protesters 'the whole

---

[6] Eaton argued in her opening brief that a second exception also applied— "an exception for failing to act when so doing subjects an identifiable person to imminent harm," Appellant's Br. 37—but acknowledged in her reply brief that she had forfeited that argument by not raising it in the district court.

29

day'"; "was 'eager' to get out of the police car"; "claimed that plowing into the crowd was 'more than reasonable'"; and "refused to give a warning because the protesters 'didn't listen to anything [the police] said.'" Appellant's Br. 39 (citations omitted).

We are not persuaded. It is not reasonable to infer malice from this evidence alone. Estabrook's having been subjected to taunting, without more, lends no support to the inference that he reacted with malice. Being eager to emerge from his vehicle is equally consistent with his stated goal of urgently responding to the Code 30. And his post-hoc statement, made during litigation, that he believed that he did not need to give a warning before knocking into the protestors says nothing about an improper purpose or malicious state of mind at the time of his conduct, at least absent additional evidence.

We accordingly affirm the district court's grant of state law governmental immunity to Estabrook on Eaton's state law claims.

## III. Conclusion

We emphasize that our holding today does not mean that Eaton will ultimately prevail in her lawsuit, or that Estabrook will not be entitled to qualified immunity at the close of evidence at trial. And even if the case were to make it to the jury, the jury might very well hear testimony leading it to conclude that Code 30 was extremely urgent; that Estabrook actually saw officers in danger; that going through Eaton seemed at the time a reasonable way to get to those officers; and that the degree of force he used was proportionate to and justified by the exigency of the Code 30. Or perhaps not. Maybe a

30

jury would conclude that Code 30 denoted something less urgent; that Eaton was not in his way at all; that Estabrook's path was not plausibly related to his purported goal; and that he could have accomplished that goal by any number of less forceful means. We do not mean to suggest that a jury must decide all of these issues in any particular way for one party or the other to prevail. But this counterfactual exercise demonstrates precisely why this case needs to go to a jury, and why resolution at summary judgment is inappropriate—we need a fact finder to decide the precise contours of what Estabrook heard and saw and did to ascertain whether he engaged in excessive force or violated clearly established law.

In sum, we hold as follows:

(1) There are factual disputes bearing on whether Estabrook's deployment of force against Eaton was unconstitutionally excessive under the Fourteenth Amendment and, if so, whether that conduct was clearly established as unlawful as of August 8, 2020, precluding summary judgment on Eaton's excessive force claim on qualified immunity grounds; and

(2) Estabrook is entitled to state governmental immunity under Connecticut law as to Eaton's state law claims because there is no evidence in the record from which a factfinder could reasonably infer that he acted with malice when colliding with Eaton.

We therefore AFFIRM the district court's judgment in part, VACATE in part, and REMAND for further proceedings consistent with this opinion.